UNITED STATES of America, Appellee,

v.

Michael D'AURIA, Defendant-Appellant.

No. 561, Docket 81–1266.

United States Court of Appeals,
Second Circuit.

Argued Jan. 20, 1982.

Decided March 2, 1982.

Harvey Stone, New York City (Schlam, Stone & Caro, New York City, of counsel), for defendant-appellant.

Vivian Shevitz, Asst. U. S. Atty., Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., E. D. N. Y., Brooklyn, N. Y., of counsel), for appellee.

Before FEINBERG, Chief Judge, and LUMBARD and MANSFIELD, Circuit Judges.

MANSFIELD, Circuit Judge:

Michael D'Auria appeals from a judgment of the Eastern District of New York, entered by Judge Charles P. Sifton after a jury trial, convicting him of one count of making false declarations before a grand jury in violation of 18 U.S.C. § 1623.[1] D'Auria's principal argument on appeal is that he made a timely offer to the prosecution to go before the grand jury and recant his false testimony, and that the prosecution's failure to allow him to do so bars his prosecution under § 1623. Because we find that D'Auria made no offer to recant and because we find no merit in any of his other contentions, we affirm the judgment of conviction.

Michael D'Auria is a former Justice of the New York State Supreme Court who was active in the Nassau County Republican Party, having served as Chairman of the Oyster Bay Republican Committee from 1965 to 1968. In 1971 he resigned from his judgeship in the face of charges of misconduct and in 1974 he was disbarred. In April 1980 he was called before a federal grand jury of the Eastern District of New York to testify pursuant to an immunity order as part of the grand jury's ongoing investigation into payments that had been made by the insurance agency of Richard B. Williams & Sons, Inc. ("the Williams Agency") to D'Auria and to other Nassau County Republican political figures. The Williams Agency served as the insurance broker for Nassau County and certain of its political subdivisions and D'Auria was called partly because as Oyster Bay Republican Chairman he had been responsible for the Agency's receiving that town's business.

At the time D'Auria was called to testify the principal targets of the grand jury investigation were Richard A. Williams (herein sometimes referred to as "Williams, Jr."),

---

1. Title 18 U.S.C. § 1623 provides in pertinent part:

"(a) Whoever under oath (or in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration shall be fined not more than $10,000 or imprisoned not more than five years, or both.

\* \* \* \* \* \*

"(d) Where, in the same continuous court or grand jury proceeding in which a declaration is made, the person making the declaration admits such declaration to be false, such admission shall bar prosecution under this section if, at the time the admission is made, the declaration has not substantially affected the proceeding, or it has not become manifest that such falsity has been or will be exposed."

who was then managing the Williams Agency, the son of the then-deceased Richard B. Williams (referred to herein as "Williams, Sr."), and Joseph Margiotta, the Chairman of the Nassau County Republican Committee. The grand jury was examining possible mail fraud, Hobbs Act, and other criminal violations that may have been committed by these and other individuals as part of an alleged "kick back" scheme involving the Agency's brokerage commissions from Nassau County municipalities.

D'Auria's first appearance before the grand jury occurred on April 24, 1980, after he had been granted immunity. Before that appearance Assistant U. S. Attorney Lawrence Silverman informed D'Auria's attorney, Raymond Grunewald, that the grand jury was investigating "any and all payments made by the Williams Agency...." The first thing that Silverman said to D'Auria when he made this appearance was that

> "this Grand Jury is conducting an investigation into the sharing of insurance premiums and commissions in Nassau County and disbursements made by the Richard B. Williams & Son Insurance Agency, and its predecessors."

Silverman further advised D'Auria that under the grant of immunity nothing he said would be used against him except that if he failed to testify truthfully he could be prosecuted for perjury.

D'Auria was shown three checks that had been made out to him in 1966, 1967 and 1968 by the Williams Agency. These checks had been shown to Mr. Grunewald before his client's appearance, thus alerting D'Auria that he would be asked about them. He explained that he had received the checks in payment for legal work he had done for the Williams Agency. Upon being shown two other checks, one written in 1973 and the other in 1974 (both of which his attorney had also seen), he explained that the 1973 check for $3,694 was in part a payment for legal services he had performed and the balance of $2,500 a gratuity, and that the 1974 check was in payment for tables he had purchased for a marina in which he and

Williams, Sr., who had since died, had business interests. The following exchange then took place:

> "Q. Other than these disbursements, sir, do you recall receiving any other moneys from Williams [Sr.], Quigley [a Williams partner], Richard A. Williams [Jr.] or any of their corporations?
>
> "A: No. On the contrary, I had to pay them some money when they threatened to sue me."

D'Auria also denied that he had ever asked anyone to intercede with Williams, Sr. in order to persuade him to make disbursements to D'Auria. Silverman later testified at trial that after hearing D'Auria's answers he spoke to Grunewald in the hall outside the grand jury room and informed him that he believed the testimony to be perjurious. Grunewald never specifically denied that he was told this.

In June of 1980, two months after the first D'Auria appearance, Williams, Jr. agreed to cooperate with the government. He then revealed (among other things) evidence of a series of indirect payments by the Williams Agency to D'Auria that added up to approximately $16,000, the bulk of which were made between 1971 and 1975. Williams explained that, after D'Auria had been forced to resign his judgeship and had fallen on harder times, D'Auria approached him and asked to be put on a list of persons to whom payments were being made out of insurance premiums received from Nassau County. Williams referred D'Auria to Margiotta, who apparently approved the request. Thereafter the Williams Agency paid, at D'Auria's instruction, various bills that he and certain of his relatives incurred. These payments included the payment of bills D'Auria had incurred at the Huntington Yacht Club and payment of insurance premiums owed to the Williams Agency by D'Auria or by businesses controlled by D'Auria's relatives, including his wife. Williams also revealed that before these indirect payments had begun and while D'Auria was still on the bench the Agency had made indirect payments of several thousand dollars in co-brokerage commissions to him.

These commissions came from clients that D'Auria, a non-broker, and a former D'Auria partner, who was a broker, had referred to the Williams Agency. They were split with D'Auria even though under New York State Insurance Law a broker may not share commissions with a non-broker. N.Y. Insurance Law § 188 (McKinney 1966).

Armed with this information the government called D'Auria back before the grand jury. He appeared on August 7, 1980, and was asked more specific questions:

"Q: Now, implicit in the questions I was asking you before, sir, now were payments made by the Williams Agency— when I say Williams Agency, I mean Williams & Quigley, Richard B. Williams & Son, Inc. or the Charlotte M. Ryan Agency or any of the three individuals, Williams, Sr., Williams, Jr., and Mr. Quigley—whether or not they were made directly to you? Other than the payments we have talked about last time, sir, that were made to you, were there any other payments made directly to you by any of those six entities in check form?

"A: When?

"Q: During the period 1971 to 1976. Do you recall any other checks made directly to you?

"A: No, sir, I don't recall. It is possible. We are covering a long period of time."

After a question about direct cash payments he was asked:

"Q: Did you ever ask any of these three individuals or any corporation to make payments to a third party on your behalf?

"A: No sir. The closest I ever came to that is when I asked them to help Curran buy the boat, which is what I already testified to the last time. That was way back."

Later he was asked:

"Q: In the same respect, if there was an outstanding obligation from the marina for the boat, did you ever ask Mr. Williams, Senior, Junior, or Quigley, to make payment to the marina for outstanding expenditures that you might had had?

"A: No sir."

He further testified:

"Q: So clearly prior to 1974 you never asked anyone to pay your insurance?

"A: Not to my recollection, no, sir.

"Q: Did you ever ask either Mr. Williams' to pay your insurance premiums?

"A: No. I asked Mr. Williams to give me some work so I could pay my insurance premiums.

"Q: But you never asked him to pay your insurance premiums?

"A: No.

"Q: To your knowledge, he never did?

"A: To my knowledge he never did.

"Q: I am referring to the period 1971 to 1976.

"A: Yes, sir."

In response to questions about whether he had ever asked Margiotta and two other Nassau County Republican leaders, Ralph Marino and James Picken, to arrange for Williams to make payments to him, D'Auria stated that he might have asked Marino to help him get legal work from Williams but that he had never asked him to arrange for unearned payments, and that he had never asked Margiotta or Picken to help him get unearned payments.

After D'Auria completed this testimony on this second appearance before the grand jury, Silverman, according to his later trial testimony, informed Grunewald that he believed that D'Auria had committed perjury by denying that payments on his behalf had been made and by denying that he had asked certain Republican Party officials to intervene with Williams on his behalf. Silverman also testified that he told Grunewald that he would recommend that D'Auria be indicted for perjury. Grunewald claims that Silverman told him only that he felt that D'Auria was lying.

Grunewald next "debriefed" D'Auria, informing him (at the very least) that Silverman believed that he had lied. The next morning, August 8, Grunewald telephoned Silverman. Grunewald testified that he told Silverman that D'Auria had not understood the "thrust of [the] inquiry," not real-

izing that it concerned, in Grunewald's words, "any small bills or anything else that was not related to the Margiotta inquiry." He requested that D'Auria be recalled before the grand jury to explain "material that should be brought to [its] attention." Silverman told him to put the request in writing. Later that day Grunewald sent Silverman a letter detailing D'Auria's position. The letter is set out in the margin.[2] In substance it stated that D'Auria wished to appear before the grand jury again in order to "add to and clarify testimony he has given" because he "did not fully understand the thrust of certain ... questions" he was asked. The letter also added that D'Auria wished "the opportunity to come forward with whatever additional information he can provide."

On October 23, 1980, Silverman brought the matter to the grand jury's attention. He read the letter in its entirety and, after stating that the government recommended that D'Auria not be recalled but that the government would do so if the grand jury desired, he asked the grand jury to vote on whether to recall him. Before leaving the room to allow a vote, Silverman stated in answer to a grand juror's question that the government intended to present an indictment against D'Auria for perjury. The grand jury then voted not to recall D'Auria.

On November 24, 1980, the grand jury handed down an indictment charging D'Auria with two counts of perjury. The first count related to his denial, during his August 7 testimony, that he had ever received indirect payments from the Williams Agency, and his denial, during his April 24 testimony, that he had ever received payments from that Agency other than those discussed. The second count related to his denial, during his August 7 testimony, that he had ever asked Margiotta, Picken, or Marino to help him obtain unearned payments from the Williams Agency.

D'Auria was represented at trial by a different attorney, Jack Korshin, Esq. At a pretrial conference on the eve of trial Korshin argued to Judge Sifton that the government's failure to call D'Auria back before the grand jury so that he could "add to and clarify" his earlier testimony

---

2. "This letter is to confirm our telephonic conversation of this date wherein I advised you that my client wishes an opportunity to add to and clarify testimony that he has given before the Grand Jury and, in particular, with respect to his testimony of yesterday, August 7, 1980.

"As I pointed out to you, my client did not fully understand the thrust of certain of your questions inclusive of some questions asked with respect to monies he received from Richard Williams, Sr. In my discussions with Mr. D'Auria immediately after his testimony yesterday, which discussions continued on to approximately 2:15 P.M., he suddenly realized that he had misunderstood the nature of some of the questions posed to him. I noted (as I told you, telephonically,) that he became visibly upset and I assured him that I would bring this matter immediately to your attention. As you know, he had to return to his duties with the New York State Guard and did so. His concern was such that he called me at my home at 8:00 A.M. this morning and asked that I convey his request to the Grand Jury that he be given the opportunity to bring to their attention whatever additional information he did not get the opportunity to convey and which, he believes, could be of interest to them and your office, in the conduct of your investigation.

"In sum, Michael D'Auria requests, in the interests of justice, the opportunity to come forward with whatever additional information he can provide and, to that extent, thereby clarify his testimony before the Grand Jury, with the object of giving as full, complete and accurate testimony as possible.

"Mr. D'Auria also requests that if you believe that, somehow, he has misstated a material fact or facts before the Grand Jury, you confront him with any evidence you believe to be contrary to his testimony so that he might have the opportunity of explaining, refuting or agreeing with it. He has no desire to protect anyone and only wishes to be as forthright as his recollection and the substantial passage of time will permit.

"As I have already stated to you, in an attempt to impartially pursue the truth, your investigation has nothing to lose by giving Mr. D'Auria the chance to come forward with whatever he knows. This would include genuine attempts to refresh his recollection from whatever sources you have available.

"It is requested that you bring this matter to the attention of the Grand Jury and that the Grand Jury acknowledge its receipt, and advise Mr. D'Auria of their decision."

amounted to prosecutorial misconduct, because it prevented him from exercising his alleged statutory right to recant. Although Korshin had failed to state this argument in an earlier motion to dismiss the indictment, Judge Sifton, with Korshin's consent, postponed consideration of the misconduct claim until after the trial.

At trial the government's principal witness, Williams, Jr., testified with respect to the first count that D'Auria had received about $16,000 in indirect payments from the Williams Agency. He explained that the payments were made by paying, at D'Auria's direction, bills that D'Auria had incurred at the Huntington Yacht Club and several other businesses he patronized. Some of the payments were made by crediting D'Auria's account at the Agency for insurance premiums owed by him and by businesses owned by him and/or his relatives. The prosecution presented numerous documents, including notes written by D'Auria, all of which proved that the payments had been requested by and made to D'Auria. The prosecution argued that D'Auria lied when on August 7 he denied ever having received indirect payments from the Agency and when on April 24 he denied that he had ever received payments from the Agency other than those discussed. It pointed to the clear falsity of D'Auria's specific denials on August 7 that his marina and insurance bills had not been paid by the Agency.

With respect to the second count, the prosecution produced a letter that D'Auria had sent to Williams in which he reviewed insurance bills he owed, explained that he had spoken to "Joe and Jim" and "Ralph Marino," and stated that "this would be taken care of" because Williams would "receive the ok" soon. Williams testified that he understood "Joe" to refer to Joseph Margiotta and "Jim" to refer to James Picken, both Nassau County Republican officials, as is Marino. Williams also testified that when D'Auria had asked to be put on the Williams Agency's Nassau County Republican payments list, he had referred D'Auria to Margiotta, and that D'Auria's request was approved by the party. On the basis of this evidence the prosecution argued that D'Auria lied when he testified that he had never asked Margiotta, Picken, or Marino to help him get gratuitous payments from the Williams Agency.

Faced with the foregoing evidence, D'Auria did not contest that he had received the indirect payments. Instead he asserted in defense that he had not thought of these payments when giving the false answers, because he understood the grand jury to be investigating the splitting of insurance commissions as part of the Margiotta political machine's fund, and the payments received by him were not related to Margiotta or politics but were in repayment of a series of loans he had made to Williams, Sr. during the early 1960s and in 1969. Because of his concentration on the issue of Nassau County insurance fund payments and because of the prosecution's refusal to allow him to examine the documents on these payments, which would have "refresh[ed]" his "recollection," he said he did not think of the indirect payments. The prosecution's evidence, of course, had been that D'Auria was on the Margiotta-approved list of recipients of kick-backs of insurance commissions. D'Auria testified that he could now see that Williams, Sr. had treated the repayment of the loan as an insurance commission kick-back, but he had had no knowledge that Williams was doing so; he had considered the payments to be loan repayments.

According to D'Auria, the loans to Williams, Sr. were to help a financially pressed marina in which he and Williams, Sr. held stock. D'Auria did not want to lend the money directly to the corporation because it appeared to be in danger of "going under," but he agreed to lend the money to Williams, Sr., who would then lend it to the corporation. In spite of his caution in not lending to the corporation he did not, according to his testimony, demand that a note evidencing the loan be executed because he and Williams were friends. From 1962 to 1970, D'Auria reminded Williams of the loans and even loaned him more money. In 1969 or 1970 he lent Williams an addi-

tional $3,500 to help him with a "personal problem."

D'Auria further testified that in 1971, after he had been forced to resign from the bench, he became financially pressed and approached Williams, Sr. requesting repayment of the loans. Initially Williams, Sr. refused, but D'Auria was able to force him to agree to repay by having a friend, John L. A. Bond, who did a substantial amount of business with the Williams Agency, threaten to switch the business to a different broker. Bond testified that he had made this threat during a private conversation between himself and Williams, Sr. Thereafter, according to D'Auria, Williams, Sr. called him, assured him that he had always intended to repay the loans, and told him that Williams, Jr. would contact him to make arrangements for doing so. When Williams, Jr. met with D'Auria he told him that the loans would be paid back indirectly so that the statute of limitations would not be reactivated. D'Auria protested but finally agreed to this arrangement. Williams, Sr., because he had died, was not available to give his version of whether the loans and repayments had been made as testified to by D'Auria.

With respect to the second count, D'Auria denied that he had ever asked Margiotta, Picken, or Marino to help him obtain unearned payments from the Williams Agency. He explained that the letter the prosecution had introduced into evidence had nothing to do with insurance commissions, involving instead his own late payment of insurance premiums as well as errors in the computation of his bills. The "Jim" in the letter was James Picken; D'Auria had spoken to him and to Ralph Marino about interceding with Williams, Sr., who was a friend of theirs, to convince him to be more patient about late payment of the premiums. The "Joe" was not, however, Margiotta; it was the Williams Agency employee responsible for the errors in his premium bills. Margiotta, Picken, and Marino all corroborated this portion of D'Auria's testimony.

The jury convicted D'Auria on the first count and acquitted him on the second. Judge Sifton then heard further testimony on D'Auria's claim that the prosecution's failure to recall D'Auria before the grand jury constituted misconduct requiring dismissal of the indictment. The judge rejected this argument as well as an argument that the prosecution had committed misconduct by seeking a perjury indictment in order to solicit D'Auria's testimony against another target of the investigation.

## DISCUSSION

D'Auria's first and principal argument on appeal is that his conviction must be set aside and the indictment dismissed because he made a timely request to recant and was wrongfully denied the opportunity to do so by the prosecution. Title 18 U.S.C. § 1623(d) provides:

"Where, in the same continuous court or grand jury proceeding in which a declaration is made, the person making the declaration admits such declaration to be false, such admission shall bar prosecution under this section if, at the time the admission is made, the declaration has not substantially affected the proceeding, or it has not become manifest that such falsity has been or will be exposed."

Whether a valid offer to recant has been made is an issue of law that must be decided by the court. *United States v. Kahn*, 472 F.2d 272, 283 n.9 (2d Cir.), *cert. denied*, 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973). Accord, *United States v. Denison*, 663 F.2d 611, 618 (5th Cir. 1981). As we noted in *United States v. Del Toro*, 513 F.2d 656, 665 (2d Cir.), *cert. denied*, 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975), "[t]he purpose [of § 1623(d) ] was obviously to induce the witness to give truthful testimony by permitting him voluntarily to correct a false statement without incurring the risk of prosecution for doing so. 2 U.S.Code Cong. & Admin.News, p. 4024 (1970)." However, as the statute makes clear, in order to recant the witness must, as a condition precedent to giving truthful testimony, admit that his perjurious testimony was

false. An outright retraction and repudiation of his false testimony is essential to a "recantation" within the meaning of the statute. Otherwise a witness, by suggesting that he might be willing to change his perjurious testimony, could still avoid telling the whole truth by engaging in a skillful discussion with the prosecution aimed at finding out what contrary evidence existed in the government's possession and then tailoring his testimony to it rather than give his truthful recollection of the facts. The government is not obligated to engage in any such demeaning process of bargaining, including giving the witness multiple opportunities to testify, for what may turn out to be a revamped version of the perjury. Indeed, as we pointed out in *Del Toro, supra,* the government is not even required to warn the witness of his statutory right to recant. *Id.* 513 F.2d at 666. See in accord, *United States v. Cuevas,* 510 F.2d 848, 851–52 (2d Cir. 1975). A witness who has lied remains obligated by his oath to tell the truth, without prodding. Unless he admits that he gave false testimony, there is no occasion for a recantation.

■ Applying these standards, the record here is clear that D'Auria neither recanted nor offered to recant his false testimony within the meaning of § 1623(d). Grunewald's representations on D'Auria's behalf did not indicate that D'Auria would admit that his perjurious testimony had been false. The Grunewald letter merely stated that D'Auria wished "an opportunity to add to and clarify" his grand jury testimony, that he had not understood certain questions, and that he wished to "come forward with whatever additional information he can provide." It did not even go so far as to say that D'Auria wished to "change" his testimony. Indeed, Assistant U. S. Attorney Silverman later testified that in his August 8, 1980, telephone call Grunewald stated that D'Auria would adhere basically to his grand jury testimony except that he would say that some of the money received by him had not been in payment for legal services, but was in payment of an insurance-related debt that the Williams Agency owed D'Auria.

In short, having been advised by the prosecutor that he was likely to be indicted for perjury, D'Auria at no time repudiated his false grand jury testimony.[3] Instead he sought, with the assistance of "any evidence you [Asst. U. S. Atty. Silverman] believe to be contrary to his [D'Auria's] testimony," to avoid the unpleasant prospect of a perjury indictment by adapting or tailoring his grand jury version without admitting its falsity. This strategy was confirmed by his later false trial testimony regarding the same subject matter, which was rejected by the jury in light of Williams' contrary testimony, supported by business records. At trial, with knowledge of the government's entire case, D'Auria described the payments received by him from the Williams Agency, which he stated that he had "forgotten" in testifying before the grand jury, as repayments of loans previously made to Williams, Sr., a story that was unsupported by any records, was inconsistent with D'Auria's other testimony,[4] and could not be refuted by Williams, Sr., who had died. Thus D'Auria's entire conduct throughout the case was

---

3. At oral argument D'Auria contended that Judge Sifton made a finding that he had offered to recant. Judge Sifton made no such finding, which would, if made, have been clearly erroneous on this record. In his opinion denying the motion to dismiss the judge stated in passing that D'Auria "decided to correct his testimony" at the time of the alleged offer to recant. The issue we consider, however, is whether D'Auria's communications with the prosecution at that time constituted an offer to recant. To the extent that there is dispute about these communications, we accept (although not required to do so) D'Auria's version of his offer and hold that his statements did not amount to an offer to admit that his earlier testimony was false, as § 1623(d) requires.

4. D'Auria, for instance, testified that Williams, Sr., in order to eliminate D'Auria's former partner, Ginsberg, from sharing in commissions on business referred by Ginsberg, agreed to make a "gift" of $1,500 per year to D'Auria. This arrangement, coupled with the Williams Agency's 1973 payment of $2,500 (out of a check for $3,694) as a gratuity, is hardly consistent with D'Auria's later testimony that Williams, Sr. was simultaneously refusing to repay loans made to him earlier by D'Auria.

that of a person who, far from wanting to recant his false grand jury testimony, unsuccessfully sought through maneuvering and dissimulation to persuade the court and jury that it was essentially the truth. Such a proposal to give additional false testimony in an effort to avoid perjury does not constitute a recantation within the meaning of § 1623(d). Prosecution for one perjury cannot be avoided by offering additional perjury.

On the erroneous assumption that he made a valid offer to recant, D'Auria next argues that he satisfied § 1623(d)'s other requirements for a valid recantation. The statute, using the disjunctive "or," provides that an admission of falsity shall bar prosecution for perjury "if, at the time the admission is made, the declaration has not substantially affected the proceeding, *or* it has not become manifest that such falsity has been or will be exposed." (Emphasis supplied). Appellant asks us to construe this language literally to prohibit prosecution if one condition (that the proceeding was not substantially affected) is satisfied even though the other (that the falsity has not become manifest) is not. The government argues that the language should be interpreted as meaning that unless both conditions are shown to exist, the purported recantation cannot stand, a view adopted by two courts of appeal, *United States v. Moore*, 613 F.2d 1029 (D.C.Cir.1979), *cert. denied*, 446 U.S. 954, 100 S.Ct. 2922, 64 L.Ed.2d 811 (1980); *United States v. Scrimgeour*, 636 F.2d 1019 (5th Cir.), *cert. denied*, —— U.S. ——, 102 S.Ct. 359, 70 L.Ed.2d 188 (1981). We find it unnecessary to resolve this issue for the reason that D'Auria did not make a valid offer to recant his false grand jury testimony.

■ D'Auria's next contention, that the grand jury was improperly used for the dominant purpose of procuring a perjury indictment and that the indictment should

therefore be dismissed, must be rejected as meritless. There was nothing improper in calling D'Auria, who had been granted immunity, before the grand jury on April 24, 1980, and for a second time on August 7, 1980. If he had told the truth his testimony would have corroborated Williams Jr.'s information about the Margiotta special fund. That information would have been valuable in the investigation of Margiotta, who was not indicted until November 1980, and other targets of the grand jury investigation.

■ We find no constitutional violation in the manner in which D'Auria's appearance was handled. A target warning is not required as a matter of constitutional law, *United States v. Washington*, 431 U.S. 181, 189, 97 S.Ct. 1814, 1819, 52 L.Ed.2d 238 (1977); *United States v. James*, 609 F.2d 36, 41 (2d Cir. 1979), *cert. denied*, 445 U.S. 905, 100 S.Ct. 1082, 63 L.Ed.2d 321 (1980).[5] More important, D'Auria was not a target of the grand jury's investigation, having been granted immunity. He was adequately protected by the warning that if he testified falsely he could be prosecuted for perjury. Nor is there any merit in D'Auria's argument that the government had an obligation to reveal to him documents in its possession in order to refresh his recollection. There is no requirement that the government reveal to a perjurer that it has evidence of the untruthfulness of his statements, much less that it reveal evidence to a witness whom it believes to have committed perjury. *United States v. Del Toro*, 513 F.2d 656, 664 (2d Cir.), *cert. denied*, 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975); *United States v. Winter*, 348 F.2d 204, 210 (2d Cir.) *cert. denied*, 382 U.S. 955, 86 S.Ct. 429, 15 L.Ed.2d 360 (1965).

D'Auria's argument that the district court erred in not allowing the jury to decide whether his "attempt to recant" was timely is rejected. Since no valid offer to

---

5. Under *United States v. Jacobs*, 547 F.2d 772 (2d Cir. 1976) ("*Jacobs II*"), *cert. granted*, 431 U.S. 937, 97 S.Ct. 2647, 53 L.Ed.2d 254 (1977), *cert. dismissed as improvidently granted*, 436 U.S. 31, 98 S.Ct. 1873, 56 L.Ed.2d 53 (1978), we may require such a warning as an exercise of our supervisory power. In *Jacobs II*, however, the witness, unlike D'Auria, was a target of the Grand Jury's investigation and indeed was indicted on the charge of threatening to kidnap, 18 U.S.C. § 875(c).

recant was made by D'Auria, it becomes unnecessary to decide whether his efforts to add to and clarify his testimony were timely.

■ D'Auria next claims that the cumulative effect of the charge to the jury and the wording of the indictment denied him a fair trial. Since he never objected to the charge, any objection he might have made, absent plain error, was waived. *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977); *United States v. Clemente*, 640 F.2d 1069, 1081 (2d Cir. 1981); see Fed.R.Cr.P. 30. With respect to the indictment, as we said in *United States v. Bonacorsa*, 528 F.2d 1218, 1222 (2d Cir.), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2647, 49 L.Ed.2d 386 (1976):

"Because of appellant's failure to move for the withdrawal of the allegedly ambiguous questions and answers as possible assignments of perjury or in some equivalent manner to focus the attention of the trial court on their asserted infirmities, the error allegedly resulting from their submission has not been preserved for review by this Court."

■ D'Auria's final argument is that the admission of certain evidence about his resignation from the bench and his disbarment was improper. In the context of this case we find no error in the admission of this proof. The prosecution introduced evidence that D'Auria had resigned from the bench and had been disbarred. The only reference to the underlying facts was in a portion of D'Auria's own grand jury testimony that was read to the jury, wherein he attempted to put the facts in a light favorable to him by skimming over exactly what he was alleged to have done as the grounds for disbarment and explaining that the trial judge who heard his case had cleared him but that the appellate court had reversed. The government argues that this evidence was relevant to the issue of D'Auria's intent to lie with respect to the matters which were the subject of the perjury counts since, as a man about to be disbarred, D'Auria would not have been likely to receive legal business from the Williams Agency,

and therefore his grand jury testimony that one of the checks he had received at this time was partly in payment for legal services was false. Invoking the rule that similar false statements are admissible as evidence bearing on D'Auria's intent to lie, see Fed.R.Evid. 404(b); *United States v. Reed*, 639 F.2d 896 (2d Cir. 1981); *United States v. Tramunti*, 500 F.2d 1334, 1346 (2d Cir.), *cert. denied*, 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1974), the prosecutor contends that D'Auria's alleged false characterization of an earlier payment as one for legal fees indicates that D'Auria intended to lie with respect to later payments allegedly made to him, which were the subject of the perjury counts. Normally we would consider the probative value of evidence of a defendant's prior disbarment to be outweighed by its prejudicial effect. Here, however, D'Auria sought to avail himself of these unhappy events in his life by himself testifying to them as the reason why he in 1971 pressed Williams, Sr. for repayment of the loans claimed to have been made earlier. In doing so he opened himself up to the risk that the jury would infer that his need for money, brought on by these events, constituted a reason for soliciting and accepting payments from Williams' Nassau County insurance fund list. At no time has D'Auria argued to us that he would not have introduced evidence of his resignation and disbarment. Thus any error in admitting evidence of these facts as part of the prosecution's case-in-chief was harmless.

In his defense D'Auria testified that when he was before the grand jury he had had no records to refresh his memory about the Williams Agency's indirect payments and that this had contributed to his not answering the questions correctly. Upon cross-examination the prosecution brought out that D'Auria had made a similar claim during his disbarment proceedings, despite which the appellate court had found his story to be false. Since D'Auria's credibility and intent as a witness were the central issue in the present case and the same claim of forgetfulness and misunderstanding were made in a prior similar proceeding, the

evidence regarding his disbarment was properly admitted as bearing on his credibility.

Evidence revealing D'Auria's disbarment was also properly admitted upon cross-examination of John L. A. Bond, who was called by D'Auria and testified that Williams, Sr. had admitted in confidence that he owed $16,000 to D'Auria. The prosecution brought out on cross-examination that at the D'Auria disbarment hearing Bond had given similar testimony about events that only he and D'Auria had witnessed, which was intended to help D'Auria but was disbelieved. There was no objection to this questioning, which was relevant for purposes of impeaching Bond's credibility.

In view of all of these circumstances, including the trial judge's careful limiting instructions, we are persuaded that any error in admitting evidence of D'Auria's disbarment was clearly harmless. We find no merit in appellant's other claims of error.

The judgment of conviction is affirmed.