**UNITED STATES of America**

v.

**Patrick REGAN, Defendant.**

**No. 95 Cr. 29 (DC).**

United States District Court, S.D. New York.

July 28, 1995.

Mary Jo White, United States Attorney for the Southern District of New York by Deborah E. Landis, Assistant United States Attorney, New York City, for U.S.

David S. Greenfield, New York City, for Defendant.

## OPINION

CHIN, District Judge.

In this perjury prosecution of a New York City police officer, defendant Patrick Regan moves to dismiss the indictment or portions thereof on the grounds that (1) the declarations alleged to be false in the indictment were not "material" to any Grand Jury investigation but were elicited solely as part of a "perjury trap," (2) the Grand Jury that issued the present indictment was not properly instructed on the element of "materiality," (3) the indictment fails to properly allege "materiality," and (4) the questions upon which the indictment are based are "fundamentally ambiguous" and therefore insufficient to support the charges of perjury. Regan also moves to disqualify the two prosecutors who questioned him before the Grand Jury on the grounds that he may call them as witnesses or, if he does not, that they are "unsworn witnesses."

For the reasons that follow, defendant's motions are denied in all respects.

## The Facts

In 1991 and 1992, Regan was a member of the 34th Precinct Anti–Crime Unit, a plainclothes unit of the New York City Police Department that operated in the Washington Heights area of Manhattan and focused primarily on violent crime. This prosecution is based on Regan's testimony in the Grand Jury on October 13 and 18, 1994. Regan is charged with committing perjury when he was questioned in the Grand Jury about certain telephone calls he had with two brothers, Ramon and Jose Rodriguez. The telephone calls had been placed to Regan by the Rodriguez brothers at the behest of Government investigators, who were investigating whether members of the Anti–Crime Unit had engaged in a pattern of, among other things, falsifying the circumstances of arrests they made.

### A. The Almonte Case

On August 14, 1992, Regan and two other members of the Unit arrested one Jorge Almonte on narcotics and firearms charges. Almonte was turned over to federal authorities for prosecution. The officers represented to the authorities that, while driving on 187th Street, they noticed Almonte stepping from the basement of a building with a gun in his waistband. They also represented that after they gave chase, Almonte dropped a bag containing narcotics before running back into the building.

After Almonte's arrest, his attorney represented to the Government that the officers had falsified the circumstances surrounding Almonte's arrest. In October 1992, the United States Attorney for the Southern District of New York and the Internal Affairs Division of the New York City Police Department commenced an investigation into whether members of the Anti–Crime Unit had made false statements in connection with the arrest of Almonte and others.

After interviewing a number of witnesses, including a cable installer who had been working in the building in question at the time of Almonte's arrest, the Government determined that the police officers' version of

the events following Almonte's arrest appeared to be untrue. Eventually, the Government filed a *nolle prosequi* and the charges against Almonte were dismissed.

## B. *The Nieves Case*

On July 22, 1992, three members of the Anti–Crime Unit arrested two individuals, Nieves and Abreu, for possession of firearms and narcotics. Regan was not involved, but two of the three officers were also later involved in the arrest of Almonte. At a suppression hearing in the federal prosecution that followed, the officers testified that they saw someone climb out of a window with a gun in his waistband and then retreat back into the window. At the same time, one of the officers saw another man inside the same apartment, standing at the window holding a gun. One of the officers testified that after they eventually entered the apartment, he accidentally bumped into a table with a sliding top, causing the top to slide open to reveal, "in plain view," a secret compartment holding firearms, ammunition and narcotics.

The suppression motion was denied. Thereafter, however, new evidence concerning the arrest of Nieves and Abreu came to light that indicated that some of the events described by the officers during their testimony in the suppression hearing had not happened and, indeed, were physically impossible. Consequently, the Government determined, based on this new evidence as well as concerns arising from the *Almonte* case, that further investigation into the officers' accounts was warranted. After conducting further investigation, the Government concluded that the officers involved in the *Nieves* case had not been truthful. Hence, the Government filed a *nolle prosequi* and the charges against Nieves and Abreu were dismissed.

## C. *The Government's Investigation of the Anti–Crime Unit Broadens*

The Government thereafter contacted the New York County District Attorney's Office to inquire about other cases in which members of the Anti–Crime Unit had participated. After conducting its own review, the District Attorney's Office referred several cases to the United States Attorney's Office for further review.

In November 1992, investigators interviewed Regan. He was advised that he and other members of the Anti–Crime Unit were under investigation. He denied, however, that he or any other members of the Unit had engaged in any misconduct. Thereafter, and continuing into 1994, an extensive Grand Jury investigation was conducted by the Government into whether members of the Anti–Crime Unit had engaged in a pattern of falsifying the circumstances of arrests they made, committing perjury, and otherwise violating the civil rights of individuals arrested. The Government interviewed many witnesses and presented evidence to the Grand Jury. No indictments were issued however, and the term of the original Grand Jury apparently expired.

By May 1994, in part because the cable installer who had been present in the building in question on the date of Almonte's arrest could no longer be located, the Government no longer viewed as viable a prosecution against the Anti–Crime Unit officers involved in the *Almonte* case. The Government was, however, still considering whether to seek an indictment against the three officers involved in the *Nieves* case.

## D. *The Rodriguez Brothers*

In May 1994, the Government was informed by a cooperating witness named Jose Rodriguez that he had information about members of the Anti–Crime Unit. He advised the Government of a meeting he had with his brother Ramon, Regan and other members of the Anti–Crime Unit in December 1992. He provided information to the effect that Regan and other members of the Anti–Crime Unit were trying to locate Jorge Almonte in or about December 1992. Indeed, he stated that during the December 1992 meeting, Regan had asked Jose Rodriguez and his brother for their assistance in trying to locate Almonte, and Regan gave an address on 187th Street where they were to look for Almonte. Jose Rodriguez also advised the Government of other contact he had with Regan following the December 1992 meeting.

The information provided to the Government by Jose Rodriguez was corroborated in certain respects. For example, Rodriguez stated that Regan had told him that he had been transferred from the 34th Precinct to the 24th Precinct; the fact of the transfer was confirmed by Internal Affairs. Rodriguez also stated that he had been confined with Almonte at the Metropolitan Correctional Center in 1992, and that fact also was confirmed by the Government. Consequently, the Government decided to investigate Rodriguez's allegations further.

On June 2, 1994, at the instruction of investigators, Jose Rodriguez telephoned Regan at the 24th Precinct to say that he had located Almonte. In fact, Rodriguez had not located Almonte, but Rodriguez was asked to call Regan to obtain corroboration for Rodriguez's allegations that he knew Regan and had spoken to him about the investigation into the Anti–Crime Unit and to obtain evidence shedding light on Regan's motive for seeking Almonte. Rodriguez reached Regan, and the telephone conversation was recorded. The transcript confirms that Regan knew Rodriguez and that Regan had previously talked to Rodriguez about "that guy" from "187th Street." The transcript also shows that Regan said to Rodriguez: "[W]e're just going to let things die down and go whatever way they're going to go."

The Government met with Ramon Rodriguez on August 26, 1994. Although the Government had doubts about his credibility,[1] it decided that it was important to interview Ramon Rodriguez about what he knew about the Anti–Crime Unit. Ramon Rodriguez told the Government that he had been an informant for the Anti–Crime Unit on several cases and that he had been actively involved with Regan. Ramon Rodriguez also advised the Government that Regan had told him that members of the Anti–Crime Unit wanted to plant drugs on Almonte, who had accused the officers of having stolen money from them. Rodriguez also stated that Regan had given him a photograph of Almonte and had asked him to try to locate Almonte.

Rodriguez also stated that he had told Regan that he was going to be interviewed by federal authorities about the Anti–Crime Unit and that Regan had instructed him to telephone after the meeting to report what had transpired.

Investigators asked Ramon Rodriguez to telephone Regan, as Regan had purportedly requested, to report on the interview. On August 26, 1994, under the supervision of investigators, Ramon Rodriguez telephoned Regan, and the call was recorded. The transcript shows that Rodriguez spoke to Regan about his interview at length; Regan asked a number of questions about what the investigators had asked Rodriguez; he also suggested to Rodriguez that he tell the investigators that the officers "were very good cops" and that Rodriguez tell them not to "bother" him again.

Thereafter, Ramon Rodriguez was served with a Grand Jury subpoena returnable September 4, 1994. He was told, however, that he would not have to appear on that date if he continued to make himself available.

On August 29, 1994, Ramon Rodriguez called Regan, and again the conversation was recorded. The transcript shows that Rodriguez reported to Regan on a second interview he had with the authorities. The transcript shows that during the conversation, Rodriguez and Regan discussed Almonte; near the end of that particular discussion, the transcript shows that Regan said to Rodriguez: "You know nothing, you understand?"

Thereafter, Ramon Rodriguez made three more telephone calls to Regan: on September 8, 14 and 27, 1994. They talked about a subpoena that Rodriguez had received and inquiries the investigators had made about Almonte and a photograph of Almonte. Regan denied knowing who Almonte was.

### E. *Regan's Grand Jury Testimony*

At or about the end of September 1994, the Government decided to grant immunity to Regan in exchange for his testimony. The Government decided to immunize Regan be-

---

1. According to Regan's present attorney, Ramon Rodriguez has admitted giving false information in another case to a prosecutor not involved in this case. Apparently, the Government does not intend to call Ramon Rodriguez as a witness in this case.

cause: (1) there was insufficient evidence at that point to charge any of the three officers involved in the *Almonte* case; (2) the Government was hopeful that Regan would provide evidence to permit the Government to proceed against the other two officers involved in the *Almonte* case; (3) those two officers were also involved in the *Nieves* case and the Government was hopeful that Regan might have knowledge of the circumstances of that case; and (4) the Government was hopeful that Regan would provide testimony that would be helpful with respect to another arrest in which Regan and other members of the Anti–Crime Unit had been involved that had occurred in the vicinity of Broadway and 170th Street, during which one of the other officers fired his weapon.

While the Assistant United States Attorney in charge of the investigation, Deborah E. Landis, recognized that Regan might commit perjury rather than implicate his fellow police officers, she was hopeful that he would testify truthfully and thereby provide evidence that would shed light on the *Almonte* case and other matters in question.

Regan appeared before the Grand Jury on October 13 and 18, 1994 under a court-ordered grant of immunity. He was examined in the Grand Jury by Ms. Landis as well as Assistant United States Attorney Paul Gardephe. He was asked questions about the Anti–Crime Unit, the Unit's use of confidential informants, conversations he had had with the Rodriguez brothers, the *Almonte* case, the *Nieves* case, and the arrest at 170th Street and Broadway during which one of the officers discharged his weapon. During these sessions, he was also asked the questions and provided the answers that form the basis for the present charges of perjury.

Although he had been recorded having one conversation with Jose Rodriguez in June 1994 and five conversations with Ramon Rodriguez in August and September 1994, during which they discussed the federal investigation of the Anti–Crime Unit at length, Regan testified in the Grand Jury in October 1994 that (a) he could remember nothing about his conversations with Ramon other than that Ramon called to say hello, (b) he and Ramon did not discuss anything about the investigation other than Regan saying that the officers were under investigation, (c) he was not aware of whether Ramon had been questioned by the federal authorities, (d) he could not recall Ramon saying that he had been questioned, (e) he could not recall Ramon saying that he had been subpoenaed, (f) he could not recall having any conversation with Jose, and (g) he did not even know Jose.

### F. *The Indictment*

Prior to seeking a perjury indictment, the Government met with Regan's prior counsel. The Government offered Regan and his then-attorneys the opportunity to review the tape recordings of the conversations with the Rodriguez brothers, and told Regan's counsel that the Government was still interested in seeking a truthful explanation of the *Almonte* matter.

Regan and his counsel accepted the Government's offer and listened to the tape recordings. The Government then advised Regan that if he were to concede that he had not been truthful in his answers in the Grand Jury about the *Almonte* case, the Government would want to ask follow-up questions that had been foreclosed by his testimony. Although a follow-up meeting was scheduled, Regan and his then-counsel failed to appear for the scheduled meeting.

The next day, the indictment in this case was issued.

### DISCUSSION

### A. *Materiality*

Regan's principal argument is that the declarations alleged to be false in the indictment were not "material" to any Grand Jury investigation, but were elicited solely as part of a "perjury trap." Regan argues that his due process rights were violated because he was subpoenaed to testify, not for any legitimate investigatory objective, but "for the primary purpose of obtaining testimony from him in order to prosecute him later for perjury." *Wheel v. Robinson,* 34 F.3d 60, 67 (2d Cir. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1697, 131 L.Ed.2d 560 (1995) (*quoting United States v. Chen,* 933 F.2d 793, 796–97 (9th Cir.1991)).

■ In *Wheel,* while noting that some courts have accepted the "perjury trap" defense, the Second Circuit declined to decide whether the defense is available in this Circuit, for the facts of *Wheel* rendered the defense inapplicable. 34 F.3d at 67–68. Hence, the validity of the "perjury trap" defense is an open question in this Circuit.

■ Likewise, I do not reach the issue, for it is clear from the record before me, which includes the minutes from the Grand Jury proceedings, which I have reviewed *in camera,*[2] that the Grand Jury was conducting a *bona fide* investigation into suspected wrongdoing by the Anti–Crime Unit. The record unequivocally shows that Regan was subpoenaed by the Grand Jury not for the purpose of "trapping" him into committing perjury, but for the purpose of seeking evidence that would assist the Grand Jury in its inquiry into the activities of the Anti–Crime Unit. The questions that were put to him were intended to assist in, and were material to, that inquiry. *See Wheel,* 34 F.3d at 68 ("perjury trap" defense "inapplicable" where there was "a legitimate basis both for the inquest and for the particular questions that [the defendant] answered falsely").

The test for materiality is whether "the question posed is such that a truthful response could potentially aid the inquiry or a false answer hinder it." *United States v. Gribben,* 984 F.2d 47, 51 (2d Cir.1993) (*quoting United States v. Moon,* 718 F.2d 1210 (2d Cir.1983), *cert. denied,* 466 U.S. 971, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984)). The standard "is whether the false testimony has a natural effect or tendency to influence, impede, or dissuade the grand jury from pursuing its investigation." *Gribben,* 984 F.2d at 51–52.

Regan argues that his testimony in the Grand Jury was not "material" because there was no legitimate Grand Jury investigation pending, only a "perjury trap" set by prosecutors disappointed with their inability to indict any member of the Anti–Crime Unit. Regan's accusation, however, that the Government abused the Grand Jury process is based on assumptions and speculation. Regan is simply wrong about a number of factual issues, and the record before me unequivocally shows that the Government did not engage in any improper conduct.

Regan contends that the Grand Jury was not informed that the telephone calls made by the Rodriguez brothers were, to use his counsel's word, "staged." In fact, the Grand Jury was advised that the Rodriguez brothers were asked by Internal Affairs to make the telephone calls, that Jose Rodriguez was instructed by Internal Affairs to tell Regan that he had seen Almonte, and that the telephone calls were recorded. Hence, the Grand Jury was not misled into believing these calls were actually instigated by the Rodriguez brothers themselves. Moreover, as set forth in more detail below, Regan is simply wrong when he argues that he was not asked questions intended to elicit information about the Anti–Crime Unit's arrest of Almonte or others. He is simply wrong when he alleges that the Government asked irrelevant questions and refused to try to refresh his recollection or quote him portions of the transcripts of the telephone conversations. Finally, and most fundamentally, he is simply wrong when he claims that the Grand Jury was not actually investigating the Anti–Crime Unit. The record plainly shows that it was.[3]

### B. *The Government's Instructions to the Grand Jury on Materiality*

■ Based on what can only be described as sheer speculation, Regan argues that "the Grand Jury was not properly instructed on

---

**2.** Citing a long line of cases, the Government argues that inspection of the Grand Jury minutes is not warranted because of the speculative nature of Regan's allegations. *See, e.g., United States v. Leung,* 40 F.3d 577, 582 (2d Cir.1994) ("A review of grand jury minutes should not be permitted without concrete allegations of Government misconduct ..."). While I agree that Regan has not made a sufficient showing, I have

nonetheless reviewed the Grand Jury minutes out of an excess of caution.

**3.** In fact, the caption on the transcripts of the Grand Jury proceedings of October 18 and 25, 1994 submitted for *in camera* review shows the name of one of the other members of the Anti–Crime Unit (followed by *"et al."*) as the first-named defendant.

the element of 'materiality'." (Greenfield Aff. in Support of Motion to Dismiss ¶ 3). The minutes of the Grand Jury proceedings, however, show otherwise. The relevant portion of the statute, 18 U.S.C. § 1623, was read to the Grand Jury, and the Grand Jury was instructed that the standard for materiality was whether a truthful response could potentially aid the Grand Jury's inquiry or whether a false response could potentially hinder the inquiry. This instruction was completely consistent with the test for materiality set forth in *Gribben,* 984 F.2d at 51, and *Moon,* 718 F.2d at 1237. Moreover, the Grand Jury was specifically instructed to consider whether the answers given by Regan could potentially have assisted the Grand Jury in determining, among other things, the relationship between the Anti–Crime Unit and Jose Rodriguez, the relationship between the Anti–Crime Unit and Ramon Rodriguez, and whether there was a plan to plant drugs on Jorge Almonte. Finally, the Grand Jury was specifically cautioned that the materiality requirement was intended to ensure that no one was indicted for perjury for testifying to something that was "completely irrelevant to a legitimate inquiry." By indicting Regan, the Grand Jury showed that it believed Regan had testified to something that was indeed relevant to a legitimate inquiry.

## C. *Sufficiency of the Indictment*

Regan challenges the sufficiency of the indictment on the grounds that it purportedly "says nothing" about what the Grand Jury was investigating or about the presentation of any evidence to the Grand Jury. Relying on *United States v. Slawik,* 548 F.2d 75, 78 n. 5 (3d Cir.1977), Regan argues that the indictment in this case should have alleged what was "material" to the Grand Jury's investigation.

▇ As a factual matter, however, Regan is again incorrect. Paragraph 11 of the indictment charges that Regan was subpoenaed to appear before a Grand Jury "[i]n connection with the federal investigation into

the activities of the Anti–Crime [Unit] members and their relationship with Ramon and Jose Rodriguez." [4] Paragraphs 1 through 10 of the indictment provide background information as well as certain details of the investigation. In particular, paragraph 4 alleges that the United States Attorney and the New York City Police Department Internal Affairs Bureau initiated an investigation, later joined in by the Federal Bureau of Investigation, "into whether members of the Anti–Crime Unit had made false statements in connection with the arrest of Jorge Almonte and other individuals." Finally, paragraphs 12 and 14 allege that Regan made "false material declarations" in his testimony to the Grand Jury.

A fair reading of the indictment reveals that it does give sufficient notice of what the Grand Jury was investigating: whether members of the Anti–Crime Unit made false statements in connection with the arrest of Jorge Almonte and others. Moreover, the indictment tracks the language of the perjury statute and contains more than sufficient detail to inform Regan of the charges against him and to enable him to plead double jeopardy in the event he were to be prosecuted in the future on the basis of the same events. *Russell v. United States,* 369 U.S. 749, 763–64, 82 S.Ct. 1038, 1046–47, 8 L.Ed.2d 240 (1962); *United States v. Stavroulakis,* 952 F.2d 686, 693 (2d Cir.), *cert. denied,* 504 U.S. 926, 112 S.Ct. 1982, 118 L.Ed.2d 580 (1992); *see also United States v. Tramunti,* 513 F.2d 1087, 1113 (2d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 55, 46 L.Ed.2d 50 (1975) ("an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime") (citation omitted).

The indictment is adequately pleaded.

## D. *Ambiguity*

Regan next argues that the indictment or, at minimum, certain specifications thereof, must be dismissed on the grounds that the

---

**4.** Regan argues that the reference to "federal investigation" in paragraph 11 of the indictment is inadequate, contending that a "federal investigation" is not necessarily the equivalent of a "Grand Jury" investigation. These arguments

are rejected. First, the words "federal investigation" on their face clearly encompass a Grand Jury investigation. Second, the Grand Jury before which Regan appeared in fact was investigating the Anti–Crime Unit.

questions asked of him in the Grand Jury were "fundamentally ambiguous" or "too inartfully phrased to support a charge of perjury." Both Regan and the Government rely on *United States v. Lighte,* 782 F.2d 367, 375 (2d Cir.1986), in which the Second Circuit held that "[w]hen a line of questioning is so vague as to be 'fundamentally ambiguous,' the answers associated with the questions posed may be insufficient as a matter of law to support [a] perjury conviction." *See also United States v. Wolfson,* 437 F.2d 862, 878 (2d Cir.1970); *United States v. Landau,* 737 F.Supp. 778, 781–84 (S.D.N.Y.1990) (" '[p]recise questioning is imperative as a predicate for the offense of perjury' "; the "burden [is on the questioner] 'to pin the witness down to the specific object' of the [questioner's] inquiry") (*quoting Bronston v. United States,* 409 U.S. 352, 360, 362, 93 S.Ct. 595, 601, 602, 34 L.Ed.2d 568 (1973)).

In *Lighte,* the Court explained that "[a] question is fundamentally ambiguous when it 'is not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony.' " 782 F.2d at 375 (*quoting United States v. Lattimore,* 127 F.Supp. 405 (D.D.C.), *aff'd per curiam by an equally divided court,* 232 F.2d 334 (D.C.Cir.1955)). *Lighte* also clearly stated, however, that the defense of ambiguity may not be established by taking a statement out of context. 782 F.2d at 375.

In the present case, Regan makes essentially two arguments. First, he contends that in the Grand Jury he acknowledged that he had conversations with two individuals named Rodriguez but could not recall the specifics; he claims that the Government did not provide him with a specific quote or "any other form of probing" and that the Government refused his requests to have his recollection refreshed. (Def. Mem. on Ambiguity at 5–6). Second, he argues that certain specifications were "fundamentally ambiguous" or "too inartfully phrased," citing in particular specifications (a), (b), (f), (i), (t) through (w), (x), (y), (aa), and (ee) of Count 1 and specifications (f), (g), (1) and (q) of Count 2.

As to Regan's first argument, he is simply incorrect as a factual matter. As the transcripts of his Grand Jury testimony show, the Government quoted from or paraphrased the transcripts of the telephone conversations and probed Regan's memory by asking about specifics of the telephone conversations numerous times. (*See* Landis Aff., Exh. G at 47 ("Q ... "I'm trying to focus on things that would be more fresh in your mind...."), 48 ("Q Did he tell you ...?"), 49, 55 ("Q Does the name Jose refresh your recollection?"), 57 ("Q Did Ramon Rodriguez speak to you within the last three months about having been questioned regarding ...?"), 62 (asking about discussions with Ramon Rodriguez about Internal Affairs Officer Thomas McGillan), 67; Landis Aff., Exh. H at 60 (quoting from transcript of telephone conversation), 61–62 ("Q Isn't it a fact, Officer Regan, that when Jose Rodriguez told you that he had just seen the guy from 187th Street, that you responded 'that's good, but we are going to let things die down and go whatever way they are going to go' and that you said to him later in the conversation that you are going to, 'play things by the book?' "), 72–73).

While it is true, as Regan asserts, that he asked during his Grand Jury testimony whether the Government had "any paperwork or ... recorded conversations" that he could use to refresh his recollection (Landis Aff., Exh. H at 56), there certainly was no obligation on the part of the Government to show Regan the transcripts or even to reveal to him that the conversations with the Rodriguez brothers had been recorded. Indeed, the Government was entitled to question Regan on the basis of his recollections without showing him a transcript. *See United States v. D'Auria,* 672 F.2d 1085, 1093 (2d Cir.1982) ("There is no requirement that the government reveal to a perjurer that it has evidence of the untruthfulness of his statements, much less that it reveal evidence to a witness whom it believes to have committed perjury."); *United States v. Del Toro,* 513 F.2d 656, 664 (2d Cir.), *cert. denied,* 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975) ("there is no duty on the prosecution to tell a Grand Jury witness what evidence it has against him" or to disclose existence of tape-record-

ings); *United States v. Costarelli,* 685
F.Supp. 35, 36–37 (E.D.N.Y.1988) (rejecting
defendant's contention that Government
should have revealed the contents of his
wiretapped conversations prior to his Grand
Jury testimony).

■ As to the specifications that Regan
contends are fundamentally ambiguous or so
unartfully phrased as to be insufficient to
support a perjury charge, I find that they are
not. I have carefully reviewed the questions
and answers in issue and I have read, in their
entirety, both transcripts of Regan's Grand
Jury testimony; I have no doubt that Regan
understood the questions that were put to
him.

When the specifications are placed in con-
text, it is clear that Regan was being asked
for his recollections about (a) the "four or
five" conversations he acknowledged having
had with Ramon Rodriguez in the three or
six months immediately prior to his appear-
ance in the Grand Jury and (b) a telephone
conversation that he had had with Jose Rod-
riguez in the same general time frame. It is
also clear that Regan understood this. The
fact that some of these questions used open-
ended words such as "anything else" and
"ever" did not render the questions, when
considered in context, fundamentally ambigu-
ous. *See United States v. Kross,* 14 F.3d
751, 756 (2d Cir.), *cert. denied,* —— U.S. ——,
115 S.Ct. 99, 130 L.Ed.2d 48 (1994) ("We
agree ... that 'ever' is not an imprecise
word."). When Regan was asked, for exam-
ple, whether he had "ever" told Ramon Rod-
riguez not to mention his name "in connec-
tion with any questioning of the Anti–Crime
Unit" (Landis Aff., Exh. G at 67),[5] Regan
surely understood the question to include the
conversation he had with Ramon Rodriguez
on August 29, 1994, less than two months
earlier, when he twice told Rodriguez "don't
mention my name." (Landis Aff., Exh. D at
28).

5. Regan argues that the use of the word "of"
renders the phrase "questioning *of* the Anti–
Crime Unit" in specification (aa) fundamentally
ambiguous, because the words could have im-
plied "questioning [of Rodriguez] *by* the Anti–
Crime Unit." (Def. Mem. on Ambiguity at 9–10).

The motion to dismiss the indictment or
portions of it on the ground of ambiguity is
denied.

**E.** *Disqualification*

Finally, Regan moves to disqualify from
participating in the trial of this action Assis-
tant United States Attorneys Landis and
Gardephe, the two prosecutors who examined
him in the Grand Jury. Regan contends that
it his intention to call both prosecutors as
witnesses at trial to establish that they (i)
refused to advise him in advance of the sub-
ject matter of the Grand Jury's inquiry, (ii)
refused to ask certain questions and to pro-
vide him with tapes and transcripts when he
asked to have his recollection refreshed, and
(iii) treated him with sarcasm, contempt and
hostility. He further argues that even if the
prosecutors are not called to testify at trial,
they should be disqualified because otherwise
they will function as "unsworn witnesses."

The arguments made by Regan are re-
markably similar to the arguments rejected
by Judge Owen in *United States v. Wallach,*
788 F.Supp. 739 (S.D.N.Y.), *aff'd,* 979 F.2d
912 (2d Cir.1992), *cert. denied,* —— U.S. ——,
113 S.Ct. 2414, 124 L.Ed.2d 637 (1993) (*citing
United States v. Schwartzbaum,* 527 F.2d
249, 253 (2d Cir.1975), *cert. denied,* 424 U.S.
942, 96 S.Ct. 1410, 47 L.Ed.2d 348 (1976)).
In *Wallach,* the defendant moved to disquali-
fy two Assistant United States Attorneys
from retrying a case following a reversal of
the defendant's conviction in the first trial on
the grounds that the prosecutors were "moti-
vated by a desire to 'vindicate' themselves"
and because they would be called as wit-
nesses or would act as "unsworn witnesses."
788 F.Supp. at 742–44. The Court denied
the motion, finding that persons other than
the prosecutors could testify, that the neces-
sity of certain testimony would be obviated
by the Government's offer to stipulate to
certain facts, and that the Government would
be prejudiced by a "late-hour" reassignment

When placed in context, however, the question is
unambiguous; Regan clearly understood that he
was being asked whether he had ever instructed
Rodriguez not to mention his name during any
questioning of Rodriguez by federal investigators
about the Anti–Crime Unit.

of the case to different prosecutors. 788 F.Supp. at 744.

■ As the Court held in *Wallach*, to call a prosecutor as a witness, "a defendant must demonstrate a compelling and legitimate need to do so." 788 F.Supp. at 743. Where witnesses other than the prosecutor can testify to the same matters in question, no compelling need exists. *Wallach*, 788 F.Supp. at 744 (*citing United States v. Roberson*, 897 F.2d 1092, 1098 (11th Cir.1990)). *See also United States v. Torres*, 503 F.2d 1120, 1126 (2d Cir.1974) (reversing a conviction where prosecutor testified to impeach the testimony of Government witness, and there was no showing that other witnesses were unavailable to testify).

■ Here, Regan has failed to demonstrate a "compelling and legitimate need" to call Assistant United States Attorney Landis as a witness and he has failed to show good reason for disqualifying her. First, the Government will stipulate to the fact Ms. Landis refused to inform Regan of the subject matter of the Grand Jury's inquiry prior to his appearance. Second, the Government's thought processes in deciding what questions to ask, how to ask them, and whether or not to refresh defendant's recollection are not relevant. Third, Assistant United States Attorney Gardephe is not participating in the trial of this case and he is available to testify even if his testimony were to be relevant. Fourth, Regan's argument that Ms. Landis will become an "unsworn witness" is unconvincing, for every lawyer in every trial is to some extent an "unsworn witness." In many criminal cases, defense counsel seek to make an issue out of the prosecutor's conduct, *e.g.*, by cross-examining witnesses on whether prosecutors sought to influence their testimony or offered inducements for favorable testimony, and disqualification cannot be ordered every time this happens. Fourth, unlike in many situations where prosecutors become potential witnesses because of their personal involvement, here there was a court reporter present in the Grand Jury transcribing every question and answer. Finally, the Government would be prejudiced were I to disqualify Ms. Landis now, for she has spent an extensive amount of time on this case; it would be unfair at this late date to require the Government to bring in a new prosecutor with trial to commence in some two weeks.

The request to disqualify Ms. Landis is denied. The request to disqualify Mr. Gardephe is moot, as the Government has represented that he will not be participating in the trial of this case.

## CONCLUSION

For the reasons set forth above, defendant Regan's motions are denied in all respects.

■ One final issue needs to be addressed. The Supreme Court's decision in *United States v. Gaudin*, —— U.S. ——, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995), makes it clear that "materiality," as an element of the crime of perjury, is an issue to be decided by the jury. Regan's "perjury trap" defense, however, which is premised on his allegations that the Government abused the Grand Jury process and thereby violated his due process rights (Def. Mem. on Materiality at 5–8), is an issue not for the jury but rather for the Court. *See United States v. Cuervelo*, 949 F.2d 559, 567 (2d Cir.1991) (motion alleging "outrageous governmental conduct" is a matter of law for trial court to decide); *United States v. Nunez–Rios*, 622 F.2d 1093, 1098 (2d Cir.1980) (claim that Government misconduct violated defendant's due process rights was "not for the jury to consider, but must be decided by the trial court"). Since I have now rejected the "perjury trap" defense, evidence in support of it will not be permitted at trial.

SO ORDERED.