UNITED STATES of America, Appellee,

v.

Patrick REGAN, Defendant–Appellant.

No. 569, Docket 96–1211.

United States Court of Appeals, Second Circuit.

Argued Nov. 4, 1996.

Decided Jan. 6, 1997.

Matthew E. Fishbein, and Craig A. Stewart, of counsel), for Appellee.

Bennett M. Epstein, New York City, (David S. Greenfield, New York City, on the brief), for Defendant–Appellant.

Before: FEINBERG, LEVAL, and PARKER, Circuit Judges.

LEVAL, Circuit Judge:

Defendant Patrick Regan appeals from a judgment of the United States District Court, Southern District of New York (Denny Chin, *Judge*), convicting him, following a jury trial, of perjury in violation of 18 U.S.C. § 1623, and sentencing him to a term of imprisonment of one year and one day, a term of supervised release of two years, and a special assessment of $100.

On appeal, Regan challenges the district court's pre-trial rulings (1) refusing to dismiss the indictment on account of the government's alleged abuse of the grand jury process, (2) precluding him from introducing at trial evidence that the government's investigation was illegitimate and that the witnesses who inspired the investigation were untrustworthy, and (3) denying his motion to call as a witness the prosecutor who interviewed him before the Grand Jury or to disqualify her from prosecuting his trial. Regan also argues that the evidence of materiality was insufficient and that the district court improperly enhanced his sentence for "substantial interference with the administration of justice."

We affirm the judgment of the district court in all respects.

### Background

In 1991 and 1992, Regan worked in the 34th Precinct Anti–Crime Unit, a plain-clothes unit of the New York City Police Department that operated in Washington Heights, Manhattan and focused largely on violent street crime.

On August 14, 1992, Regan and two other members of the Anti–Crime Unit arrested Jorge Almonte for possession of narcotics and a firearm. The Anti–Crime Unit turned Almonte over to federal authorities for prose-

Deborah E. Landis, Assistant United States Attorney, New York City (Mary Jo White, United States Attorney for the Southern District of New York, New York City,

cution, representing that the arresting officers saw him with a gun in his waistband and that when they began to chase him he dropped a bag containing narcotics. When Almonte's attorney claimed that the officers were lying about the circumstances of his client's arrest, the government began to investigate whether members of the Anti–Crime Unit had lied about this and other arrests.

After interviewing the arresting officers and other witnesses, including a worker who had been installing cable in Almonte's building and had no connection to Almonte, the government developed doubts about the officers' account of events following Almonte's arrest. Because its case against Almonte depended on the testimony of these officers, the government filed a *nolle prosequi* and declined to prosecute the case.

On July 22, 1992, three members of the Anti–Crime Unit, including the two officers with whom Regan arrested Almonte, arrested individuals named Nieves and Abreu on guns and narcotics charges. Regan was not involved in this arrest. During the federal prosecution of Nieves and Abreu, it became apparent that those officers' accounts of this arrest were also false. As a result, the government filed a *nolle prosequi* and the charges were dismissed.

In the autumn of 1992, the government began an investigation, assisted by the New York County District Attorney's Office and the Special Narcotics Prosecutor's Office, to determine whether the misconduct in the *Almonte* and *Nieves* cases was part of a broader pattern within the Anti–Crime Unit. This investigation continued well into 1994.

In May 1994, the government interviewed José Rodriguez (José), a confidential informant for the Drug Enforcement Administration (DEA). José claimed that in December 1992 he and his brother, Ramon Rodriguez (Ramon), had met with Regan and other members of the Anti–Crime Unit about locating Almonte. José said that he believed that the officers wished to find Almonte in order to "set [him] up" by placing drugs on him, or for some other bad purpose. José's knowledge of the Almonte case and details about

Regan and the other officers enhanced his credibility with the government.

Investigators then arranged for José to call Regan and to claim that he had located Almonte. The resulting tape-recorded telephone call suggested that José and Regan had previously discussed Almonte. To obtain additional corroboration for José's claims, the government contacted his brother Ramon, who had previously worked as a DEA informant but was "no longer considered entirely reliable."

Ramon initially denied having any information about misconduct in the Anti–Crime Unit. But in an interview on August 26, 1994, at the United States Attorney's Office, he said that he had worked as an informant for the Anti–Crime Unit, which was not authorized to use informants. Ramon also said that Regan had told him that members of the Anti–Crime Unit wanted to "plant" drugs on Almonte and had given him a photograph to assist in locating Almonte.

During this interview, investigators showed Ramon pictures of members of the Anti–Crime Unit. He was able to identify several of them by name and also to give Regan's beeper number. Ramon said that on the previous evening he had told Regan that he was to be questioned by federal authorities about the Anti–Crime Unit. He also claimed that Regan told him to lie about his relationship with the Anti–Crime Unit and instructed him to report back about the substance of his interrogation.

During this meeting, investigators told Ramon to call Regan and tape-recorded the ensuing conversation, in which Regan extensively questioned Ramon about his meeting with federal authorities, referred specifically to cases under investigation, including the *Almonte* and *Nieves* cases, and coached Ramon about how to respond to questioning.

In several subsequent tape-recorded telephone conversations during August and September of 1994, Regan asked Ramon for details of his meetings with federal authorities, including the names and positions of the individual investigators, and advised him about appropriate responses. On one occa-

sion, he specifically told Ramon not to mention his name.

At the end of August 1994, the term of the Grand Jury that had heard testimony about the Anti–Crime Unit expired. As the investigation was not complete, the government did not seek an indictment from that Grand Jury, but convened a second Grand Jury to continue the investigation. At that point, the government could not locate the cable installer who had provided the evidence demonstrating that Regan and his colleagues had lied about Almonte's arrest. As a result, the government felt that it had inadequate evidence to proceed against Regan. The government believed, however, that Regan could provide evidence about misconduct by his colleagues. It therefore decided to immunize Regan under 18 U.S.C. § 6001 *et seq.* and subpoena him to testify before the second Grand Jury.

Represented by counsel, Regan appeared before the Grand Jury on October 13, 1994 and October 18, 1994. Assistant United States Attorney (AUSA) Deborah Landis conducted most of the examination of Regan. AUSA Paul Gardephe was also present for most of the proceedings and sometimes questioned Regan.

During Regan's appearance on October 13, the government asked him about his use of informants and his relationship with Ramon. Among other things, Regan denied that he had spoken with Ramon about the federal investigation of the Anti–Crime Unit or about the arrests that were the subject of that investigation, that Ramon had told him that he had been subpoenaed and questioned with respect to the investigation, and that he had advised Ramon about proper responses to potential questions. Regan also denied that he had asked the Rodriguez brothers to help him locate Almonte and that José had told him that he had located Almonte.

During his appearance before the Grand Jury on October 18, 1994, Regan said, among other things, that he did not remember Ramon mentioning Almonte's name. Regan also said that he did not recall having a conversation with Ramon about the fact that Ramon had been interviewed by federal authorities and the Internal Affairs Bureau

concerning the Anti–Crime Unit. Regan testified that "it would be no of [sic] significant importance for me whether [Ramon] was being interviewed or not."

After Regan's testimony, the government presented the successor Grand Jury with a summary of the evidence previously introduced before the first Grand Jury. Before seeking an indictment for perjury, members of the U.S. Attorney's Office met with Regan and his attorney and informed them of the nature of the investigation of the Anti–Crime Unit and the tape-recorded conversations. The AUSAs explained that Regan's lies had prevented the government from exploring before the Grand Jury the circumstances surrounding the arrest of Almonte and the alleged plot to set him up. The AUSAs allowed Regan to listen to the tapes with his attorney and made clear that they were still looking for a truthful explanation. They said that if Regan confessed his earlier falsities, they would then have additional follow-up questions for him.

After reviewing the tapes, Regan's attorney arranged to meet with the government before the scheduled Grand Jury hearing. But Regan and his attorney did not appear at the appointed time or explain their absence. Thereafter the Grand Jury issued a two-count indictment charging Regan with perjury in violation of 18 U.S.C. § 1623. The indictment alleged that Regan made "false material declarations" before the Grand Jury.

Before trial, Regan moved to dismiss the indictment and to disqualify AUSAs Landis and Gardephe, who had questioned him before the Grand Jury. In seeking dismissal of the indictment, Regan argued principally that his allegedly false statements were not "material" to any legitimate investigation by the Grand Jury and that the government had elicited those statements by abusing the grand jury process and entrapping him into perjury. As to the disqualification of Landis and Gardephe, Regan argued that he needed to call them as witnesses to testify about their examination of him before the Grand Jury and that allowing them to represent the

government would enable them to act as unsworn witnesses at trial.

The district court denied all of Regan's pre-trial motions. *United States v. Regan,* 897 F.Supp. 748 (S.D.N.Y.1995). The court found the record "unequivocally shows that Regan was subpoenaed by the Grand Jury not for the purpose of 'trapping' him into committing perjury, but for the purpose of seeking evidence that would assist the Grand Jury in its inquiry into the activities of the Anti–Crime Unit." *Id.* at 754. The court also ruled that the Grand Jury was properly instructed on the issue of materiality, that the indictment gave sufficient notice of the charges against Regan, and that the questions posed to Regan before the Grand Jury were not too ambiguous to support perjury charges. *Id.* at 755–57. Finding that Regan had not demonstrated a "compelling and legitimate need" to call Landis as a witness and rejecting the concern that she could act as an unsworn witness, the court denied Regan's motion to disqualify her. *Id.* at 758.

The court also ruled that Regan's "perjury trap" defense was a question of law concerning outrageous governmental conduct, not a question of "materiality" for the jury to decide. Having rejected this defense as a matter of law, the court precluded Regan from presenting evidence at trial to support it. *Id.*

On August 7, 1995, three days before trial was scheduled to begin, the government informed the court that it would not call José Rodriguez as a witness at trial. As a result, it dropped four perjury specifications to which José would have testified. The government said that it still wished to introduce the allegations of the Rodriguez brothers, not for their truth, but to show the basis for its investigation, and thus the materiality of Regan's statements. The government asked the court to instruct the jury that the statements of the Rodriguez brothers were being introduced not for their truth, but only for the limited purpose of showing the subject matter of the Grand Jury's investigation and thereby establishing the materiality of Regan's remarks.

At a hearing on the same day, Regan asked the court for permission to present the jury with a defense of "contrived materiality." This defense apparently was to consist of an argument that the prosecutors "were a little bit zealous to justify the investigation and presented half-truths and untruths to the [grand] jury."

In a memorandum decision dated August 9, 1995, the district court rejected Regan's "contrived materiality" defense as "essentially his perjury trap argument under a different label." Finding that the government was not offering the Rodriguez brothers' allegations for their truth, and that evidence impeaching their credibility would have little probative value and would cause confusion, the court ruled that it would exclude evidence "intended solely to attack [their] credibility."

After a five-day trial, the jury convicted Regan on 28 specifications of perjury and acquitted him on 18 specifications. In particular, the jury found that Regan committed perjury when he denied knowing that Ramon had been questioned and subpoenaed with respect to the federal investigation, denied having any interest in what Ramon told the investigators, and denied having told Ramon not to mention his name to the investigators.

After denying all of Regan's post-trial motions, the court sentenced him on March 19, 1996. Finding that Regan's perjury had substantially interfered with the administration of justice, the court, under U.S.S.G. § 2J1.3(b)(2), applied a three-level enhancement to his base offense level of twelve, resulting in an adjusted offense level of fifteen and a sentencing range of 18–24 months. Over the government's objection, the court departed downward under U.S.S.G. § 5K2.O, imposing a sentence of one year and one day of imprisonment and two years of supervised release.

### Discussion

On appeal, Regan argues that the district court erred in (1) refusing to dismiss the indictment on account of the government's alleged abuse of the grand jury process, (2) precluding him from introducing at trial evidence that the government's investigation was illegitimate and that the witnesses who

inspired the investigation were untrustworthy, (3) denying his motion to call AUSA Landis as a witness or to disqualify her as prosecutor, (4) ruling that the evidence of materiality was sufficient to support the jury's verdict, and (5) enhancing his sentence for "substantial interference with the administration of justice."

## I. *The Pre–Trial Rulings*

### A. *Propriety of the Grand Jury Proceedings*

■ Invoking the "perjury trap" doctrine, which this court has discussed but not adopted, *see Wheel v. Robinson,* 34 F.3d 60, 67–68 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1697, 131 L.Ed.2d 560 (1995), Regan argues that the district court should have dismissed the indictment for improprieties surrounding his grand jury testimony. In essence, Regan claims that the government violated the due process clause of the Fifth Amendment by calling him before the Grand Jury "for the primary purpose of obtaining testimony from him in order to prosecute him later for perjury," *id.* at 67 (quoting *United States v. Chen,* 933 F.2d 793, 796 (9th Cir.1991)), and that this conduct required dismissal of the indictment. We have noted that the existence of a "legitimate basis" for an investigation and for particular questions answered falsely precludes "any application of the 'perjury trap' doctrine." *Wheel,* 34 F.3d at 68.

The record supports the district court's ruling that the government had legitimate grounds to investigate the Anti–Crime Unit, to call Regan before the Grand Jury, and to ask the questions that Regan answered falsely. The government decided to subpoena and immunize Regan after almost two years of investigation into the conduct of the Anti–Crime Unit. At that time, it had obtained evidence that members of that unit had made false statements with respect to numerous state and federal prosecutions and had sought to plant drugs on Almonte. Furthermore, there was evidence that Regan had communicated with the Rodriguez brothers about Almonte and had coached Ramon about what to tell investigators. It was therefore appropriate for the government to ask Regan about his conversations with the Rodriguez brothers.

In short, it is clear that the government was conducting a bona fide investigation into allegations of wrongdoing by the Anti–Crime Unit and that its decision to immunize and subpoena Regan was a step in that investigation. The record thus amply supports the district court's finding that the government did not call Regan solely in order to entrap him into committing perjury. As in *Wheel,* 34 F.3d at 67–68, we find that the facts of this case "render the perjury trap defense inapplicable" and thus do not decide whether this defense is available in the Second Circuit.

Regan also claims that the government abused and misled the Grand Jury and abused its process by (1) calling him as the first witness without establishing the basis for the inquiry; (2) calling him on short notice and refusing to disclose the subject of the inquiry; (3) asking him almost no questions about "real" events and focusing instead on details of "staged" conversations; (4) refusing to play the tape recordings of his conversations with the Rodriguez brothers or otherwise to refresh his recollection; (5) questioning him in a hostile and intimidating manner; and (6) failing to inform the Grand Jury that a prior Grand Jury had investigated the Anti–Crime Unit without returning an indictment, that the Rodriguezes were unreliable witnesses, or that the allegations against the Anti–Crime Unit had been disproven. Regan says that these tactics were designed to elicit false answers and thus deprived him of due process, requiring dismissal of the indictment.

■ We have reviewed the record relating to Regan's grand jury testimony and find that the government's conduct was proper in all respects. First, the government was under no obligation to present the Grand Jury with contextual evidence before calling Regan to testify. Indeed, it could reasonably have anticipated that Regan's truthful testimony would provide the Grand Jury with all the background information it would need. When Regan's testimony proved not to include such information, the government

called Sergeant McGuigan, an officer involved in the investigation of the Anti–Crime Unit, to give the Grand Jury more details about that investigation. We find nothing improper in the order in which the government choose to present evidence to the Grand Jury.

■ Second, the record refutes Regan's contention that the government brought him before the Grand Jury on short notice and, by refusing to grant an adjournment, required him to appear with substitute counsel. Regan in fact received ten days' notice of the Grand Jury proceedings, and was forced to appear with new counsel not because his original attorney was unavailable on the scheduled day, but because that attorney's representation of another member of the Anti–Crime Unit created a possible conflict.

■ The government's refusal to tell Regan the subject matter of the grand jury proceeding was appropriate. The government believed, not unreasonably, that if Regan knew this subject matter in advance, he might fabricate testimony to exculpate himself and other members of the Anti–Crime Unit. (Moreover, the record suggests that advance warning about the nature of the grand jury inquiry would not have altered Regan's testimony. His testimony at the second hearing on October 18, 1994, after the substance of the inquiry had become clear, was essentially the same as his initial testimony on October 13, 1994.)

■ Third, we reject Regan's contention that the government questioned him only on insignificant matters about which he would likely have no recollection. The government asked questions central to its investigation of the Anti–Crime Unit: To wit, questions about Almonte's original arrest, the alleged attempts to locate him, the arrest of Nieves and Abreu, the Anti–Crime Unit's use of informants, and another arrest by the Anti–Crime Unit. That the government also questioned Regan extensively about his telephone conversations with the Rodriguez brothers was in no way improper. Those conversations suggested misconduct in the Anti–Crime Unit and were therefore a logical subject for questioning.

■ Fourth, the transcript of Regan's grand jury testimony also contradicts his claim that the government made no attempt to refresh his recollection about his conversations with the Rodriguez brothers. On several occasions, the government paraphrased or quoted from the transcripts of the recordings of these conversations. Moreover, the government's questions were neither vague nor focused on insignificant details that might slip from memory. On the contrary, the prosecutors asked Regan if he had spoken with the Rodriguez brothers within a specific time period and asked him to describe the general contours of the conversations. It is true the government never played its recordings of these conversations. But it was under no obligation to do so, *United States v. D'Auria,* 672 F.2d 1085, 1093 (2d Cir.1982), or even to inform Regan that such recordings existed. *United States v. Del Toro,* 513 F.2d 656, 664 (2d Cir.), *cert. denied,* 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975).

■ Fifth, we find no basis for Regan's argument that the government created a hostile, confusing environment during his grand jury testimony, with the two prosecutors "taking over for each other every few lines." In fact, AUSA Landis asked most of the questions; AUSA Gardephe participated only occasionally.

Finally, we reject Regan's contentions that the government knowingly presented the Grand Jury with false evidence and withheld from it material exculpatory evidence. These arguments are premised on factual and legal errors. Regan contends, for example, that the government concealed the fact that a prior Grand Jury had exonerated the Anti–Crime Unit. The first Grand Jury reached no such conclusion. Its term expired before the completion of its investigation.

■ Regan also claims that the government knowingly allowed José Rodriguez to testify falsely before the Grand Jury that he had no prior relationship with Almonte. This allegation is based on mere speculation arising from a police report from November 1992 stating that a person named José Rodriguez

rented a basement apartment in the building on 187th Street in which Almonte lived. As 173 persons named José Rodriguez were listed in the 1991–92 Manhattan and Bronx telephone books, and there was no apparent connection between Almonte and the basement apartment, the existence of this one report hardly suggests that the government knew of a prior connection between José and Almonte. Moreover, AUSA Landis has affirmed that she did not even learn of this report until August of 1995. On this record, we cannot conclude that the government knowingly presented perjured testimony to the Grand Jury. .

 Regan also takes issue with the government's failure to inform the Grand Jury of the Rodriguez brothers' criminal histories and general untrustworthiness and to provide it with other possibly exculpatory material. The government had no obligation to present exculpatory material to a grand jury. *United States v. Williams,* 504 U.S. 36, 51–52, 112 S.Ct. 1735, 1744–45, 118 L.Ed.2d 352 (1992).

Having considered Regan's various objections to the circumstances surrounding his testimony before the Grand Jury, we find no evidence of impropriety and no support for his arguments. Accordingly, we affirm the district court's decision not to dismiss the indictment.

### B. *"Contrived Materiality"*

 Regan argues that the district court erred in preventing him from introducing evidence at trial that the grand jury investigation was illegitimate. Regan contends that *United States v. Gaudin,* —— U.S. ——, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995), requires the government to prove, and the jury to find, that he made a false statement that was material to a *legitimate* grand jury investigation. Regan says that the district court first erred in precluding him from introducing evidence of the illegitimacy of the grand jury proceedings, and then compounded the error by instructing the jury that the court had found the proceedings legitimate. We disagree with Regan's reading of *Gaudin* and affirm the decision of the district court. .

In *Gaudin,* a prosecution for making a false statement on an HUD form in violation of 18 U.S.C. § 1001, the Supreme Court held that because materiality is an essential element of that offense, the jury, not the court, must determine whether a false statement is material. *Id.* at ——, 115 S.Ct. at 2320. Although *Gaudin* involved a different offense, we assume its reasoning also applies to perjury prosecutions under 18 U.S.C. § 1623.

In ruling that the jury must determine the materiality of a false statement, the Supreme Court did not purport to alter the longstanding definition of that element. This court has held since at least 1927 that the test of materiality is simply "whether the false testimony has a natural effect or tendency to influence, impede, or dissuade the grand jury from pursuing its investigation." *Carroll v. United States,* 16 F.2d 951, 953 (2d Cir.), *cert. denied,* 273 U.S. 763, 47 S.Ct. 477, 71 L.Ed. 880 (1927). The Supreme Court has specifically endorsed this test. *Kungys v. United States,* 485 U.S. 759, 770, 108 S.Ct. 1537, 1546, 99 L.Ed.2d 839 (1988). The many cases reciting and applying this standard do not require an additional finding that the investigation be "legitimate," and we will not add this element without a clear reason for doing so.

To expand the definition of materiality in the manner Regan proposes would require juries in perjury cases to evaluate the government's motives for bringing particular investigations, its conduct before grand juries, and the quality of the evidence submitted to grand juries. As these considerations are wholly distinct from "materiality," in the sense of the pertinence of the particular testimony to the investigation, adding this requirement would add a new element to the crime. We see no reason to do so.

 Nor was it error for the district court to prevent Regan from presenting his "contrived materiality" defense to the jury. Although Regan attempts to characterize his claim that the grand jury investigation was a sham as an affirmative defense to the crime of perjury, the argument is, as the district court observed, "essentially his perjury trap argument under a different label." As such, his claim turns not on the fact that his con-

duct was somehow blameless or justified, but rather on the notion that "outrageous governmental conduct" required dismissal of the indictment. *See United States v. Cuervelo,* 949 F.2d 559, 565 (2d Cir.1991).

■ A motion to dismiss an indictment on account of outrageous government conduct is directed to the court rather than jury. *Id.* at 567. Indeed, we have specifically noted that it is "preferable to leave any issues of the lawfulness of the grand jury inquiry for determination by the Court." *United States v. Rosado,* 728 F.2d 89, 95 (2d Cir.1984). *Rosado* exemplifies why the lawfulness of a grand jury investigation is better left to the court. In that case, involving a trial for criminal contempt for refusing to give evidence, we observed that the district court's admission of evidence about the propriety of the grand jury proceedings had turned the trial "away from a determination of whether the elements of the offense charged had been proved beyond a reasonable doubt into a wide-ranging inquiry into matters far beyond the scope of legitimate issues in a criminal trial." *Id.* at 93.

■ Moreover, whether it bears the name of "perjury trap" or "contrived materiality," Regan's claim that the government called him before the grand jury solely to elicit perjured testimony is, like a claim of selective prosecution, ultimately separate from the issue of his factual guilt. The Supreme Court has observed that a "selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *United States v. Armstrong,* —— U.S. ——, ——, 116 S.Ct. 1480, 1486, 134 L.Ed.2d 687 (1996). Because it involves a "defect in the institution of the prosecution," the selective prosecution defense is an issue for the court rather than the jury. *See, e.g., United States v. Jones,* 52 F.3d 924, 927 (11th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 265, 133 L.Ed.2d 187 (1995); *United States v. Washington,* 705 F.2d 489, 495 (D.C.Cir.1983) (citing Fed. R.Crim.P. 12(b)(1)).

Regan's claim is similarly unrelated to factual innocence of the crime charged. Regan does not contest that he lied before the grand jury. Rather, he contends that his lies were not "material" because the government staged its investigation in order to elicit his lies. As a result, his claim stems from a constitutional violation in the institution of his prosecution, rather than factual innocence, and was properly resolved by the court. *See* Fed.R.Crim.P. 12(b)(1). *Cf. United States v. Taylor,* 562 F.2d 1345, 1356 (2d Cir.), *cert. denied,* 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977) (citing Rule 12(b)(1) as basis for resolution by court of selective prosecution claim).

In short, we believe that *Gaudin* does not require us to expand the definition of materiality in the manner Regan argues, and also that to do so would involve juries in an inquiry for which they are ill-suited. For this reason, we agree with the district court's decision to resolve for itself whether the government's conduct was lawful and to prevent Regan from presenting evidence on that subject.

### C. *Impeachment of the Rodriguez Brothers*

■ Regan argues that the district court erred in preventing him from introducing evidence to impeach the credibility of the Rodriguez brothers. He maintains that although the Rodriguez brothers did not testify, their allegations of misconduct by members of the Anti–Crime Unit were introduced to prove such misconduct. Because these allegations were admitted for their truth, Regan argues, the district court's refusal to allow him to cross examine or impeach the Rodriguez brothers deprived him of his right to confrontation.

Despite Regan's vehement protestations to the contrary, it is clear that the statements of the Rodriguez brothers were not introduced for their truth. The district court repeatedly instructed the jury that the allegations of misconduct made by the Rodriguez brothers and by other witnesses were not offered for their truth, but simply as "background evidence" of the events that led to the investigation of the Anti–Crime Unit. It is obvious from the record that the govern-

ment respected the court's instructions and did not attempt to convince the jury that the allegations were true. We have previously made clear that a district court need not allow impeachment of even a "central figure" whose out-of-court statements were not admitted for their truth. *United States v. McGowan*, 58 F.3d 8, 15–16 (2d Cir.1995). The district court found that "[e]vidence attacking the credibility of the Rodriguez brothers would have little if any probative value, and if permitted, [would] surely unfairly prejudice or mislead the jury and confuse the issues." The district court correctly deemed the credibility of the brothers irrelevant to the issues before the jury and properly excluded evidence impeaching them.

### D. *Disqualification of AUSA Landis*

■ The district court denied Regan's motion to disqualify AUSA Landis because it found that he had not shown a "compelling and legitimate need" to call her as a witness or any other "good reason" to disqualify her. *Regan*, 897 F.Supp. at 758. Regan now argues that she was a non-essential participant in the trial and improperly appeared as an unsworn witness for the government. He also contends that he was unable to call her as a witness on the issue of the government's misconduct before the Grand Jury.

■ Regan's arguments are entirely without merit. A defendant who wishes to call a prosecutor as a witness must demonstrate a compelling and legitimate reason to do so. *United States v. Schwartzbaum*, 527 F.2d 249, 253 (2d Cir.1975), *cert. denied*, 424 U.S. 942, 96 S.Ct. 1410, 47 L.Ed.2d 348 (1976). As already discussed, the district court correctly ruled that the jury would not consider allegations of governmental misconduct before the Grand Jury. As a result, there was no genuine basis or legitimate need to call AUSA Landis as a witness before the jury on the government's motivation for bringing the investigation or about its tactics before the Grand Jury. Moreover, the district court specifically ruled that Regan could call AUSA Gardephe to testify whether there was a hostile or aggressive atmosphere during his questioning before the Grand Jury, as such an atmosphere might have

supported the argument that Regan was flustered. There was therefore no compelling reason for Landis to testify on that subject.

Furthermore, Landis played a significant role in the trial. She examined one of the two government witnesses, cross-examined one of the two defense witnesses, delivered the summation, and was present throughout the trial to assist in devising strategy. Given her familiarity with the case, replacing her without a compelling reason to do so would have been an unwarranted waste of resources.

■ Although disqualification is sometimes appropriate to prevent an attorney from "subtly impart[ing] to the jury his first-hand knowledge of the events without having to swear an oath or be subject to cross-examination," *United States v. Locascio*, 6 F.3d 924, 933 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1645, 128 L.Ed.2d 365 (1994), the facts of this case did not justify disqualifying Landis. Standing alone, the mere fact that a prosecutor took part in grand jury proceedings in which a defendant presented false testimony should not bar that prosecutor from participating in a subsequent trial for perjury. *See United States v. Reilly*, 33 F.3d 1396, 1422 (3d Cir.1994).

We have not found—and Regan has not suggested—any indication in the record that Landis sought to use her first-hand knowledge of Regan's case to influence the jury. The jury's awareness of her role in the grand jury proceedings did not by itself make Landis an unsworn witness for the government. Moreover, the government offered to remove her name from the transcripts of the grand jury proceedings so that the trial jury would be unaware of her role there, but Regan rejected this proposal, and his attorney gratuitously elicited additional comments about her activities in the investigation. We find that the district court was correct in denying Regan's pretrial motion to disqualify Landis and also that she did not act as an unsworn witness at trial.

### II. *Sufficiency of the Evidence of Materiality*

■ ■18 U.S.C. § 1623(a) provides, in relevant part: "Whoever under oath ... in any

proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration ... shall be fined under this title or imprisoned not more than five years, or both."

As already discussed, a false declaration before a grand jury is "material" if it " 'has a natural effect or tendency to influence, impede, or dissuade the grand jury from pursuing its investigation.' " *United States v. Gribben,* 984 F.2d 47, 51 (2d Cir.1993)(quoting *Carroll,* 16 F.2d at 953). Courts have "broadly construed" materiality. *Gribben,* 984 F.2d at 51. A statement in grand jury proceedings is material if a " 'truthful answer *could* conceivably *have aided* the grand jury investigation.' " *United States v. Guariglia,* 962 F.2d 160, 164 (2d Cir.1992) (quoting *United States v. Mancuso,* 485 F.2d 275, 281 (2d Cir.1973)).

A defendant challenging the sufficiency of the evidence bears "a very heavy burden." *United States v. Scarpa,* 913 F.2d 993, 1003 (2d Cir.1990). The court views the evidence "in the light most favorable to the prosecution," *United States v. Casamento,* 887 F.2d 1141, 1156 (2d Cir.1989), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990), and draws all reasonable inferences and resolves all issues of credibility in the government's favor. This court will sustain a jury verdict if "*any* rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt." *United States v. Brown,* 937 F.2d 32, 35 (2d Cir.), *cert. denied,* 502 U.S. 917, 112 S.Ct. 323, 116 L.Ed.2d 264 (1991).

Regan argues that the evidence of materiality was insufficient because the government did not provide the trial jury with adequate evidence of the nature of the investigation conducted by the Grand Jury before which he testified. Regan claims that the trial jury "was never told anything about what the grand jury was investigating" and thus had no evidence that his false testimony was material to the Grand Jury's investigation.

The trial transcript shows otherwise. At trial, the government presented ample evidence about the nature of the investigation in relation to which Regan testified before the Grand Jury. AUSA Chauncey Parker and Sergeant McGuigan both testified at length about the allegations concerning the Anti-Crime Unit and the resulting investigation of that Unit. They made clear that the New York City Police, assisted by federal authorities, had tried to find out whether members of the Anti-Crime Unit had used illegal tactics in making arrests and had lied about the circumstances of various arrests.

McGuigan explained at trial that the investigation of the Anti-Crime Unit was still pending as of September 27, 1994, and that significant questions were then still unanswered. For example, it remained unclear whether Regan and the Anti-Crime Unit had improperly used Ramon Rodriguez in investigations and arrests and whether there had been a conspiracy to frame Almonte. McGuigan said that Regan was the best person available to answer these questions.

McGuigan also told the trial jury that a federal grand jury was involved in the investigation of the Anti-Crime Unit and that on six occasions he testified before it about the investigation. Later in his testimony, McGuigan made clear that he testified four times before the initial Grand Jury and twice before the Grand Jury that indicted Regan, on "[s]imilar subject matter ... all regarding the same, overall investigation."

In addition, both the questions posed to Regan during his grand jury appearance and his answers were read into evidence. These questions and answers provided the trial jury with additional information about the nature of the grand jury investigation. For example, Regan himself stated that the Anti-Crime Unit had been under investigation for two years, that the *Almonte* and *Nieves* cases were subjects of that investigations, and that two hundred people from the 34th Precinct had been brought down for questioning.

We find that the trial jury had ample evidence of the nature of the grand jury investigation. It is clear from the trial record that the Grand Jury was investigating allegations of misconduct by members of the Anti-Crime Unit, and also that truthful answers from Regan could have assisted that

investigation. We therefore reject Regan's argument that the evidence of materiality was insufficient to support his conviction.

### III. *Enhancement of Regan's Sentence*

 The district court imposed a three-point enhancement of Regan's sentencing range because it found that his perjury "resulted in substantial interference with the administration of justice." U.S.S.G. § 2J1.3(b)(2). The first application note to this guideline provides that "[s]ubstantial interference ... includes a premature or improper termination of a felony investigation."

Regan argues that the government's investigation terminated not because of his responses to its questions, but because the government's tactics before the Grand Jury were not designed to elicit helpful answers. Once again, Regan contends that the government asked him indirect questions and refused to refresh his recollection. The district court considered and rejected these arguments before trial, specifically finding that the government's questions before the Grand Jury were not "irrelevant" and that its questions were designed to refresh his recollection of his conversations with the Rodriguez brothers. The district court's finding that the investigation terminated on account of Regan's false statements was not clearly erroneous.

Regan also argues that his answers could not have terminated an investigation because the government knew from the outset that there was no legitimate investigation. As already discussed, the district court found that the investigation of the Anti–Crime Unit was legitimate. We agree with this finding, and also with the conclusion that Regan's false testimony before the Grand Jury improperly terminated that investigation. We therefore affirm the district court's imposition of the three-point enhancement for substantial interference with justice.

### *Conclusion*

The judgment of conviction is affirmed.