184 F.3d 131 (2nd Cir. 1999)
 UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
AN ANTIQUE PLATTER OF GOLD, known as a GOLD PHIALE MESOMPHALOS C. 400 B.C.,
Defendant-in-rem,
MICHAEL H. STEINHARDT, Claimant-Appellant,
REPUBLIC OF ITALY, Claimant-Appellee.
 Docket No. 97-6319
August Term, 1998
 UNITED STATES COURT OF APPEALS
SECOND CIRCUIT
 Argued: October 14, 1998
Decided: July 12, 1999
 
 Appeal from a grant of summary judgment by the United States District Court for the Southern District of New York (Barbara S. Jones, Judge) in a civil forfeiture proceeding. Claimant contends that forfeiture of an antique gold platter because of false statements on customs entry forms or because of its status as stolen property under Italian law is not permissible. He also claims that forfeiture would violate the Eighth Amendment. We affirm.
 FREDERICK P. SCHAFFER, Schulte Roth & Zabel LLP, New York, New York (Michael S. Feldberg, Thomas R. Fallati, Carl R. Soller, Soller Shayne & Horn, New York, New York, of counsel), for Claimant-Appellant.
 EVAN T. BARR, Assistant United States Attorney for the Southern District of New York, New York, New York (Mary Jo White, United States Attorney; Gideon A. Schor, Assistant United States Attorney, of counsel), for Plaintiff-Appellee.
 STEVEN SKULNIK, Pavia & Harcourt, New York, New York (George M. Pavia, Richard L. Mattiaccio, of counsel), for Claimant-Appellee.
 Richard A. Rothman, Weil, Gotshal & Manges LLP, New York, New York (Jonathan Bloom, Richard J. Davis, Josh A. Krevitt, of counsel), for Amici Curiae American Association of Museums, Association of Art Museum Directors, Association of Science Museum Directors, American Association for State and Local History.
 Leonard V. Quigley, General Counsel, Archaelogical Institute of America, Boston, Massachusetts (Patty Gerstenblith, DePaul University School of Law, Chicago, Illinois, Gregory A. Clarick, of counsel), for Amici Curiae Archaelogical Institute of America, American Anthropological Association, United States Committee for the International Council on Monuments and Sites, Society for American Archaeology, American Philological Association, and Society for Historical Archaeology.
 Before: WINTER, Chief Judge, RESTANI,*. Judge, and MUKASEY,**. District Judge.***
 WINTER, Chief Judge:
 
 
 1
 Michael H. Steinhardt appeals from Judge Jones's ordering of the forfeiture of a "Phiale," an antique gold platter. The district court held that false statements on the customs entry forms and the Phiale's status as stolen property under Italian law rendered its importation illegal. As such, the Phiale was subject to forfeiture.
 
 
 2
 Steinhardt contends that: (i) the false statements on the customs forms were not material under 18 U.S.C. § 542, (ii) stolen property under the National Stolen Property Act ("NSPA") does not encompass property presumed to belong to the state under Italian patrimony laws, (iii) both statutes afford him an innocent owner defense, and (iv) the forfeiture violates the Eighth Amendment. We hold that the false statements on the customs forms were material and, therefore, need not reach issue (ii). We further hold that there is no innocent owner defense and that forfeiture of the Phiale does not violate the Eighth Amendment.
 
 BACKGROUND
 
 3
 At issue is a Phiale of Sicilian origin that dates from the 4th Century B.C. Its provenance since then is largely unknown, other than its possession by Vincenzo Pappalardo, a private antique collector living in Sicily, who traded it in 1980 to Vincenzo Cammarata, a Sicilian coin dealer and art collector, for art works worth about $20,000. Cammarata sold it in 1991 to William Veres, the owner of Stedron, a Zurich art dealership, for objects worth about $90,000.
 
 
 4
 Veres brought the Phiale to the attention of Robert Haber, an art dealer from New York and owner of Robert Haber & Company. In November 1991, Haber traveled to Sicily to meet with Veres and examine the Phiale. Haber informed Steinhardt, a client with whom he had engaged in 20-30 previous transactions, of the piece. Haber told Steinhardt that the Phiale was a twin to a piece in the Metropolitan Museum of Art in New York City and that a Sicilian coin dealer (presumably Cammarata) was willing to guarantee the piece's authenticity.
 
 
 5
 On December 4, 1991, Haber, acting for Steinhardt, finalized an agreement to purchase the Phiale for slightly more than $1 million -- plus a 15% commission, making the total price paid by Steinhardt approximately $1.2 million. Haber and Veres also agreed to a "Terms of Sale," which stated, inter alia, that "[i]f the object is confiscated or impounded by customs agents or a claim is made by any country or governmental agency whatsoever, full compensation will be made immediately to the purchaser." It further provided that a "letter is to be written by Dr. [Giacomo] Manganaro that he saw the object 15 years ago in Switz."[1]. In fact, Dr. Manganaro, a professor of Greek history and Numismatics, had examined the Phiale in 1980 in Sicily and had determined thereafter that it was authentic and of Sicilian origin.
 
 
 6
 On December 10, 1991, Haber flew from New York to Zurich, Switzerland, and then proceeded to Lugano, near the Italian border, where he took possession of the Phiale on December 12. The transfer was confirmed by a commercial invoice issued by Stedron, describing the object as "ONE GOLD BOWL--CLASSICAL . . . DATE--C. 450 B.C. . . . . VALUE U.S. $250,000." The next day, Haber sent a fax to Jet Air Service, Inc. ("Jet Air"), Haber's customs broker at John F. Kennedy International Airport in New York, which included a copy of the commercial invoice. Jet Air prepared an Entry/Immediate Delivery form (Customs Form 3461) to obtain release of the Phiale prior to formal entry. This form listed the Phiale's country of origin as "CH," the code for Switzerland. In addition, Jet Air prepared an Entry Summary form (Customs Form 7501), which also listed the country of origin as "CH" and stated the Phiale's value at $250,000, as Haber's fax had indicated. Haber was listed as the importer of record.
 
 
 7
 On December 15, Haber returned to the United States from Zurich with the Phiale and later gave it to Steinhardt.[2] Before completing the purchase, Steinhardt had the piece authenticated through a detailed examination by the Metropolitan Museum of Art. Thereafter, the Phiale was displayed in his home from 1992 until 1995.
 
 
 8
 Under Article 44 of Italy's law of June 1, 1939, an archaeological item is presumed to belong to the state unless its possessor can show private ownership prior to 1902. On February 16, 1995, the Italian government submitted a Letters Rogatory Request to the United States seeking assistance in investigating the circumstances of the Phiale's exportation and asking our government to confiscate it so that it could be returned to Italy. In November 1995, the Phiale was seized from Steinhardt pursuant to a warrant. Soon thereafter the United States filed the present in rem civil forfeiture action. The government claimed that forfeiture was proper under 18 U.S.C. § 545 because of false statements on the customs forms. It also claimed that forfeiture was proper under 19 U.S.C. § 1595a(c) because the Phiale was stolen property under the NSPA as a result of Article 44 of Italy's patrimony laws.
 
 
 9
 Steinhardt entered the proceeding as a claimant, and he and the government moved for summary judgment. In granting judgment for the government, see United States v. An Antique Platter of Gold, 991 F. Supp. 222 (S.D.N.Y. 1997), the district court held that the misstatement of the country of origin was material, see id. at 228-30, and, alternatively, that the Phiale was stolen property under Italian law, see id. at 231-32. The court also held that an innocent owner defense was not available under either statute, see id. at 230-32, and that the forfeiture did not violate the Excessive Fines Clause, see id. at 232-33. This appeal followed.
 
 DISCUSSION
 
 10
 We review the grant of summary judgment de novo. See Bedoya v. Coughlin, 91 F.3d 349, 351 (2d Cir. 1996). Summary judgment is inappropriate if there is a genuine dispute on any issue of material fact that could lead a reasonable factfinder to return a judgment for the nonmoving party. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).
 
 
 11
 As noted, the district court found that summary judgment was proper on either of two independent statutory bases. We hold that importation of the Phiale violated 18 U.S.C. § 545 because of the false statements on the customs forms. We need not, therefore, address whether the NSPA incorporates concepts of property such as those contained in the Italian patrimony laws. Cf. United States v. McClain, 545 F.2d 988, 994-97 (5th Cir. 1977) (adopting broad definition of property under NSPA).
 
 
 12
 Section 545 prohibits the importation of merchandise into the United States "contrary to law" and states that material imported in such a manner "shall be forfeited." 18 U.S.C. § 545.[3] The government claims that the importation of the Phiale was illegal because it violated 18 U.S.C. § 542, which prohibits the making of false statements in the course of importing merchandise into the United States. Steinhardt claims, however, that an element of a Section 542 violation is that such a false statement must be material and that the government has failed to show materiality in the instant case, at least for purposes of summary judgment. He further contends that Section 545 provides him with an innocent owner defense and that forfeiture would violate the Excessive Fines Clause of the Eighth Amendment in light of the Supreme Court's recent decision in United States v. Bajakajian, 118 S. Ct. 2028 (1998).
 
 A. Materiality Under Section 542
 Section 542 states in pertinent part:
 
 13
 Whoever enters or introduces . . . into the commerce of the United States any imported merchandise by means of any fraudulent or false invoice, declaration, affidavit, letter, paper, or by means of any false statement, written or verbal, . . . or makes any false statement in any declaration without reasonable cause to believe the truth of such statement, or procures the making of any such false statement as to any matter material thereto without reasonable cause to believe the truth of such statement [shall be guilty of a crime].
 
 
 14
 18 U.S.C. § 542. There can be no dispute that the designation of Switzerland as the Phiale's country of origin and the listing of its value of $250,000 were false. Haber had examined the Phiale in Sicily about a month before the sale to Steinhardt, and that sale was for $1 million plus 15% commission.
 
 
 15
 We have previously held that Section 542 does include a materiality requirement. See United States v. Avelino, 967 F.2d 815, 817 (2d Cir. 1992) ("[F]alse statements under Section 542 are necessarily material because the importation must be 'by means of [the] false statement.'"). While the government argues to the contrary, we see no reason to revisit our decision in Avelino.
 
 
 16
 The dispute pertinent to this appeal concerns the proper test for materiality. Steinhardt argues for a "but for" test of materiality, i.e., a false statement is material only if a truthful answer on a customs form would have actually prevented the item from entering the United States. The district court, however, employed a "natural tendency" test, asking whether the false statement would have a natural tendency to influence customs officials. See An Antique Platter of Gold, 991 F. Supp. at 230. The circuits are divided as to the proper test. The Fifth and Ninth Circuits have adopted a but for test, see United States v. Corcuera-Valor, 910 F.2d 198, 199-200 (5th Cir. 1990); United States v. Teraoka, 669 F.2d 577, 579 (9th Cir. 1982), while the First Circuit has come down in favor of the natural tendency test, see United States v. Holmquist, 36 F.3d 154, 158-61 (1st Cir. 1994); see also United States v. Bagnall, 907 F.2d 432, 436-37 (3d Cir. 1990) (noting, without deciding, that all false statements affecting the importation process are material under Section 542). We adopt the natural tendency test.[4]
 
 
 17
 The statutory language, caselaw, and the statutory purpose lead us to this conclusion. First, the statute prohibits importations "by means of" a false statement. Although there is overlap, this language is not synonymous with "because of," see Holmquist, 36 F.3d at 159 (examining in detail statutory language of Section 542), and ought not be read so narrowly. Instead, the ordinary meaning of the statutory language requires only that the false statements be an integral part of the importation process. In this case, the false statements were on custom forms and thus easily meet the by means of requirement.
 
 
 18
 Second, the Supreme Court has noted that "[t]he most common formulation of [materiality] . . . is that a concealment or misrepresentation is material if it 'has a natural tendency to influence or was capable of influencing, the decision of' the decisionmaking body to which it was addressed." Kungys v. United States, 485 U.S. 759, 770 (1988) (citation omitted). Both the Supreme Court and this circuit have employed such a standard in numerous contexts. See, e.g., id. at 771 (test for materiality under 8 U.S.C. § 1451(a) is "whether the misrepresentation or concealment was predictably capable of affecting, i.e., had a natural tendency to affect, the official decision"); United States v. Regan, 103 F.3d 1072, 1081 (2d Cir. 1997) (employing natural tendency test for 18 U.S.C. § 1623); see also Neder v. United States, U.S., 119 S.Ct. 1827,144 L.Ed.2d 35 (1999). These decisions provide a solid basis for adopting a natural tendency test under Section 542.
 
 
 19
 Finally, the natural tendency approach is far more consistent with the purpose of the statute -- to ensure truthfulness of representations made during importation -- than is a but for test. See Bagnall, 907 F.2d at 436. Under a but for test, lying would be more productive because the government would bear the difficult burden of proving what would have happened if a truthful statement had been made. Moreover, under such a test, liability would not attach for misstatements in cases where truthful answers would still have enabled the goods to enter the United States. Importers have incentives to lie for reasons not related to achieving actual entry of the goods -- e.g., to reduce the duties payable or to obtain expeditious customs treatment. Cf. Holmquist, 36 F.3d at 160 (noting that the but for test makes it "more attractive for importers . . . to practice strategic forms of deception under the guise of immateriality"). The statutory purpose would thus be frustrated by the narrow reading suggested by appellant.
 
 
 20
 We therefore hold that "a false statement is material under [S]ection 542 if it has the potential significantly to affect the integrity or operation of the importation process as a whole, and that neither actual causation nor harm to the government need be demonstrated." Holmquist, 36 F.3d at 159.[5] For a trier of fact to determine whether a statement can significantly affect the importation process, it need ask only whether a reasonable customs official would consider the statements to be significant to the exercise of his or her official duties. This analysis is analogous to the securities context, where a statement (or omission) is material if there is a "substantial likelihood" that a reasonable investor would view it as "significantly alter[ing] the 'total mix' of information made available." TSC Indus. Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976); see also Levitin v. PaineWebber Inc., 159 F.3d 698, 702 (2d Cir. 1998), cert. denied, 119 S. Ct. 1039 (1999). Folger Adam Co. v. PMI Indus., Inc., 938 F.2d 1529, 1532-34 (2d Cir. 1991) (discussing materiality under securities laws). Moreover, this test of materiality applies not only to the decision to admit an item but also decisions as to processing, e.g., expediting importation. See Bagnall, 907 F.2d at 436. With this test in mind, we turn to the misstatements on the Phiale's entry form.
 
 
 21
 Steinhardt contends that even under a natural tendency test, the misstatements are immaterial. He claims that the customs officials lacked statutory authority to seize the Phiale and that it was customs policy not to review information about the country of origin of such an object. He further argues that the statement of the Phiale's value was relevant only to the imposition of the processing fee, which was unaffected by the misstatement. Because the misstatement of the country of origin was material as a matter of law and thus proper grounds for summary judgment, we need not examine the misstatement of value.
 
 
 22
 Customs Directive No. 5230-15, regarding the detention and seizure of cultural property, fatally undermines Steinhardt's contention that listing Switzerland as the country of origin was irrelevant to the Phiale's importation. The Directive advised customs officials to determine whether property was subject to a claim of foreign ownership and to seize that property. Customs Directive No. 5230-15 (Apr. 18, 1991) [hereinafter "Directive"]. An item's country of origin is clearly relevant to that inquiry.
 
 
 23
 Steinhardt contends, however, that the Directive does not cover the Phiale and, therefore, the misstatements could not have been material because there was no legal basis for the Phiale's seizure. We disagree. The Directive provides a basis for seizing cultural property under the NSPA in the seizure provisions of 19 U.S.C. § 1595a(c). Seizure of the Phiale would clearly be authorized by this provision under United States v. McClain, 545 F.2d 988 (5th Cir. 1977), which held that violations of a nation's patrimony laws are covered by the NSPA. Because Steinhardt asserts that McClain was improperly decided, he claims that the customs officials lacked a statutory basis to seize the Phiale.
 
 
 24
 This argument, however, misperceives the test of materiality. Regardless of whether McClain's reasoning is ultimately followed as a proper interpretation of the NSPA, a reasonable customs official would certainly consider the fact that McClain supports a colorable claim to seize the Phiale as having possibly been exported in violation of Italian patrimony laws. Indeed, the Directive explicitly references the McClain decision and informs officials that if they are unsure of the status of a nation's patrimony laws, they should notify the Office of Enforcement. See Directive at 9. Knowing that the Phiale was from Italy would, therefore, be of critical importance.
 
 
 25
 Even if such a seizure might ultimately fail in court -- an issue we need not address -- the misstatement was still material because it had the "potential significantly to affect the integrity or operation of the importation process" -- the manner in which Customs handles the assessment of duties and passage of goods into the United States. Holmquist, 36 F.3d at 159. To decide otherwise would give an importer license and incentive to mislead customs officials whenever the legal basis of a seizure was somewhat unclear. If the good was actually imported without challenge then or later, the importer's goal would be achieved. If the good was stopped at customs or was later the subject of a forfeiture proceeding, the importer would still have opportunity to challenge the statutory basis for seizure. See id. at 160. As noted above, we decline to create such counter-productive incentives.
 
 
 26
 Steinhardt makes two additional arguments -- one relying on Customs Service practices, the other on the Supreme Court's decision in Kungys -- in an attempt to demonstrate that the misstatement of country of origin was not material as a matter of law. These contentions are also flawed.
 
 
 27
 He first claims that the statements were immaterial because the Customs Service had no policy of relying upon this information. In support, he provides examples in which items, such as those that listed Italy as the country of origin, were not detained. First, even if country of origin were not required, as he claims, the misstatement could still influence a customs official. See e.g., United States v. Masters, 612 F.2d 1117, 1120 (9th Cir. 1979) ("'It is immaterial that the filing . . . may not have been required by Air Force regulations in the particular circumstances . . . .'"). Misinformation that is volunteered can affect the importation process. For example, if the customs forms stated that the Phiale had been in private hands since 1800 (and thus not subject to Italian patrimony laws, see Art. 44 of Italy's Law of June 1, 1939, No. 1089), this information, which is not required, would certainly affect the judgment of a reasonable customs official. Even if Customs did not require this information, that would be insufficient to defeat summary judgment.
 
 
 28
 Second, Steinhardt's provision of instances where items entered the country without interference fails to create a disputed issue of material fact. The record does not demonstrate whether any curative oral representations were made at the time of the importation of these particular items. Moreover, virtually all of the items were valued at less than $100,000, significantly below the Phiale's value. Most critically, even if lax customs officials failed to act appropriately with some of these items, this would not preclude a finding of materiality because the proper test involves a reasonable customs official, not the least vigilant one. As the Directive makes clear, customs officials were alerted to McClain and violations of cultural property laws prior to the importation of the Phiale. A reasonable customs official should have viewed the Phiale's true country of origin as highly significant.
 
 
 29
 Finally, Steinhardt's reliance on the Supreme Court's decision in Kungys is misplaced. Kungys simply reaches the unsurprising conclusion that not all misstatements are material under the "natural tendency" test. However, its facts are inapposite to the instant case. Kungys involved a misstatement of a person's date and place of birth on his naturalization petition. Although the Court overturned the lower court's finding that this information was material, its holding turned on what the government had attempted to prove and what the lower court had found. The Court stated that "[t]here has been no suggestion that [the date and place of birth] were themselves relevant to his qualifications for citizenship," Kungys, 485 U.S. at 774 (plurality opinion) (emphasis added), and there was no finding that "the true date and place of birth would predictably have disclosed other facts relevant to his qualifications." Id. Instead of focusing on the impact of the misrepresentation, the government's evidence went to a discrepancy between the information used on the naturalization petition compared with an earlier visa application. A plurality of the Court found this analysis to be improper and stated that "what is relevant is what would have ensued from official knowledge of the misrepresented fact . . . not what would have ensued from official knowledge of inconsistency between a posited assertion of the truth and an earlier assertion of falsehood." Id. at 775. In the instant case, the relevant inquiry clearly relates to the designation of country of origin, and it is this information that has a natural tendency to influence a reasonable customs official. The statements were thus material under Section 542.
 
 B. Innocent Owner Defense
 
 30
 Steinhardt next contends that even if the statements were material, Section 545 affords him an innocent owner defense. Our discussion will assume for purposes of analysis that Steinhardt is such an innocent owner. While numerous statutes contain an explicit innocent owner defense, see, e.g., 18 U.S.C. § 981(a)(2); 21 U.S.C. §§ 881(a)(4)(C), 881(a)(7), Section 545 does not, and there is no reason to believe that the omission in Section 545 was anything but deliberate. Steinhardt argues, however, that the Due Process Clause entitles him to such a defense.
 
 
 31
 This argument has been rejected by the Supreme Court. In Bennis v. Michigan, 516 U.S. 442 (1996), the Court upheld a Michigan statute that permitted the forfeiture of an automobile co-owned by an innocent owner. In its analysis, the Court traced the long history of forfeiture laws that did not provide for such a defense. See id. at 446-51; see also United States v. Bajakajian, 118 S. Ct. 2028, 2034 (1998) ("Historically, the conduct of the property owner [in an in rem proceeding] was irrelevant; indeed the owner of forfeited property could be entirely innocent of any crime."); Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 683 (1974) ("[T]he innocence of the owner of property subject to forfeiture has almost uniformly been rejected as a defense."); Origet v. United States, 125 U.S. 240, 246 (1888) ("[T]he merchandise is to be forfeited irrespective of any criminal prosecution . . . . The person punished for the offense may be an entirely different person from the owner of the merchandise, or any person interested in it."). Against this long line of precedent, Steinhardt relies principally on dicta from Calero-Toledo and our decision in United States v. One Tintoretto Painting, 691 F.2d 603 (2d Cir. 1982), which also relied on the Calero-Toledo dicta. However, the Bennis Court explicitly rejected this language, see Bennis, 516 U.S. at 449-50, and we must follow suit.
 
 C. Eighth Amendment
 
 32
 While Steinhardt raised an Eighth Amendment claim in the district court, he did not raise it on appeal. Nonetheless, he now contends that under the Supreme Court's recent decision in United States v. Bajakajian, 118 S. Ct. 2028 (1998), handed down after the briefs were filed in this case, the forfeiture violates the Excessive Fines Clause of the Eighth Amendment. We disagree.
 
 
 33
 Bajakajian involved a criminal prosecution for failing to report the transporting of more than $10,000 out of the United States. The Court held that this proceeding triggered the Excessive Fines Clause and that the seizure of the entire amount, in excess of $357,000, would violate this constitutional safeguard. Critical to the Court's analysis, however, was that the forfeiture pursuant to Section 982(a)(1) of Title 18, which Mr. Bajakajian pleaded guilty to violating, constituted a punishment. See Bajakajian, 118 S. Ct. at 2033-35. In making this determination, the Court focused on several factors: the fine was imposed at the culmination of a criminal proceeding that required a conviction of the underlying felony and could not have been imposed upon an innocent party. See id. at 2034.
 
 
 34
 All of these factors are absent from the forfeiture at issue in the instant case, which bears all the "hallmarks of the traditional civil in rem forfeitures." Id. at 2035. First, the forfeiture here was not part of a criminal prosecution. See id. at 2034-35 (distinguishing cases directed against "guilty property" and noting that "[t]raditional in rem forfeitures were . . . not considered punishment against the individual for an offense"). While Section 545 is part of the criminal code, this fact alone does not render the forfeiture punitive.[6] Although the question whether a proceeding is civil or criminal is certainly relevant, it is not dispositive. See e.g., Austin v. United States, 509 U.S. 602, 621-22 (1993). Thus, the fact that the present action is a civil in rem proceeding weighs against a finding that it is punitive.
 
 
 35
 Even more important to the inquiry is the nature of the statute that authorizes forfeiture. As opposed to Section 982(a), the provisions at issue in Bajakajian, Section 545 is a customs law, traditionally viewed as non-punitive. See Taylor v. United States, 44 U.S. (3 How.) 197, 210 (1845) (Story, J.) (stating that laws providing for in rem forfeiture of goods imported in violation of customs laws, although in one sense "imposing a penalty or forfeiture[,] . . . truly deserve to be called remedial"). The Phiale is thus classic contraband, an item imported into the United States in violation of law. See Bennis, 516 U.S. at 459 (Stevens, J., dissenting) (describing "smuggled goods" as "pure contraband"); Bajakajian's money, which he was attempting to export, was not. It is forfeiture of the former that Bajakajian continues to recognize as nonpunitive and outside the scope of the Excessive Fines Clause.
 
 
 36
 We therefore affirm.
 
 
 
 NOTES:
 
 
 *
 The Honorable Jane A. Restani of the United States Court of International Trade, sitting by designation.
 
 
 **
 The Honorable Michael B. Mukasey of the United States District Court for the Southern District of New York, sitting by designation.
 
 
 ***
 Pursuant to 28 U.S.C. § 46(b) and an order of the Chief Judge of this Court certifying a judicial emergency, this case was heard by a panel consisting of the Chief Judge of this Court, one Judge of the United States District Court sitting by designation, and one Judge of the United States Court of International Trade sitting by designation.
 
 
 [1]
 This provision of the Terms of Sale is handwritten. It replaced a sentence that read: "A letter is to be written by Dr. Manganaro which is an unconditional guarantee of the authenticity and Swiss origin of the object."
 
 
 [2]
 Haber himself has provided no details surrounding the Phiale's purchase and importation. In his February 1, 1996 deposition, he exercised his Fifth Amendment right by refusing to answer any questions asked by the government or Steinhardt's attorney.
 
 
 [3]
 Section 545 reads, in relevant part:
 Whoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law [shall be subject to criminal penalties.]
 . . . .
 . . . .
 Merchandise introduced into the United States in violation of this section, or the value thereof, to be recovered from any person described in the first or second paragraph of this section, shall be forfeited to the United States.
 18 U.S.C. § 545.
 
 
 [4]
 Appellant argues that in United States v. Meldish, 722 F.2d 26 (2d Cir. 1983), we adopted the "but for" test the Ninth Circuit used in Teraoka. Meldish, however, cited Teraoka only for the basic proposition that "Section 542 concerns itself only with whether a false statement was made to effect or attempt to effect the entry of the goods in question." Meldish, 722 F.2d at 28 (citing Teraoka, 669 F.2d at 579). In no way did Meldish purport to adopt the "but for" standard employed in Teraoka.
 
 
 [5]
 This standard is also consistent with our holding in United States v. Greenberg, 735 F.2d 29, 31 (2d Cir. 1984):
 Where a false statement is made to a public body or its representative, materiality refers to the impact that the statement may reasonably have on the ability of that agency to perform the functions assigned to it by law. The question is not what effect the statement actually had[] . . . . The question is rather whether the statement had the potential for an obstructive or inhibitive effect.
 
 
 [6]
 The Supreme Court's decision in One Lot Emerald Cut Stones and One Ring v. United States, 409 U.S. 232 (1972) (per curiam) is not to the contrary. That case involved an acquittal after a trial for violating Section 545. A civil forfeiture pursuant to 19 U.S.C. § 1497 followed. The Court held that the latter proceeding did not violate the Double Jeopardy Clause. While it noted that Section 545 is a criminal provision, see id. at 236, the Court had no reason to reach the issue of whether a Section 545 civil forfeiture proceeding such as the instant one was punitive. Instead, it simply determined that the forfeiture at issue was "a civil sanction." Id.; see also United States v. Ursery, 518 U.S. 267, 276 (1996) (discussing Emerald Cut Stones).